UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

INNOVENTION TOYS, LLC                    CIVIL ACTION

v.                                       NO. 07-6510

MGA ENTERTAINMENT, INC.,                 SECTION "F"
WAL-MART STORES, INC. and
TOYS "R" US, INC.


<u>ORDER AND REASONS</u>

Before the Court are the contending claim construction arguments regarding the Markman hearing held on May 13, 2009. Seven disputed claim terms are at issue.

For the reasons that follow, the Court resolves the disputed claim interpretations as follows:

**"game board"** means "A structure having a playing surface that can support game pieces and electronic components."

**"space" or "spaces"** means "A location [or locations] that can be occupied by one of the game pieces."

**"game piece"** means "A mirrored or non-mirrored structure that can be placed on the game board and moved by the players during the course of game playing."

**"cavity for holding electronic components"** means "A hollow space in the raised periphery surrounding the playing surface that holds batteries and wires."

**"receptacles"** mean "Formations in the raised periphery surrounding the playing surface that contain batteries and wires."

**"mounted"** means "fixedly attached to."

**"control button"** means "A structure that activates a beam emitting device."

*Introduction*

Before the Court is the parties' request for claim construction of certain disputed terms in this patent infringement action, which arises out of the alleged infringement of United States Patent No. 7,264,242 (the "'242 patent") for a "Light-Reflecting Board Game."

On October 5, 2007, Innovention Toys, LLC sued MGA Entertainment, Wal-Mart Stores, Inc., and Toys "R" Us, Inc.[1] for patent infringement (literally and by the doctrine of equivalents). The plaintiff asserts that a product manufactured and sold by defendants, the accused Laser Battle board game, infringes the '242 patent.[2] Innovention seeks: (a) to enjoin the defendants from further infringement, (b) an award of compensatory damages under 35 U.S.C. § 154(d), (c) an award of treble damages for willful infringement, and (d) an award of reasonable attorneys' fees under 35 U.S.C. § 285. The defendants counterclaimed, seeking a declaratory judgment that the patent-in-suit is invalid, unenforceable, and not infringed by the defendants' accused product.[3]

---

[1] Toys "R" Us was added as a defendant on December 4, 2007.

[2] Innovention contends that the defendants took notice of the its game at a toy fair in 2005 and subsequently copied it.

[3] In answering the complaint, the defendants assert that: (1) they have not infringed any claim of the patent-in-suit, (2) the

## Background

The inventors of the '242 patent developed their game while one of them was an engineering professor at Tulane University and the other two were his students. In February 2005, they presented their game, which they called "Deflexion" at the International Toy Fair trade show in New York City. According to the plaintiff, MGA then attempted to obtain a patent on a copied game concept. The inventors filed provisional patent applications on February 14, 2005 and on May 11, 2005. They filed the non-provisional application on Feb 13, 2006 and the '242 patent issued on September 4, 2007.

In the board game taught by the '242 patent, each player is assigned a laser which can be activated by a control button. Players are also assigned a key piece and several game pieces, some of which are mirrored on one or both sides. The game board consists of a series of rows and columns of recessed squares. The game is played by each player taking turns either moving a game piece to an adjacent square or rotating a mirrored piece to change the angle of mirrored reflection. After a player has moved or rotated a game piece, he presses the control button to activate the laser. Any non-mirrored game piece which is illuminated by the laser beam is removed from the board. A player wins the game by

---

patent-in-suit is invalid and unenforceable, (3) the plaintiff is estopped from asserting infringement under the doctrine of prosecution history estoppel.

causing the laser beam to illuminate his opponent's key piece.

In 2006, the plaintiff became aware of MGA's Laser Battle game, which relates to a board game that involves shooting a laser beam at mirrored game pieces in order to reflect the beam onto (and thus eliminate from the game) an opponent's game pieces; Innovention brought this action for infringement on October 9, 2007. Plaintiff moved for summary judgment on the issues of validity and infringement on December 29, 2008. Defendants, in turn, requested that the Court grant summary judgment that the '242 patent is invalid for lack of novelty and obviousness. On February 9, 2009, the Court denied the cross-motions for summary judgment without prejudice, and ordered the parties to submit proposed claim constructions and to advise as to whether a Markman hearing was necessary to resolve any disputed claim interpretations.

The parties submitted opening and responsive claim construction memoranda and now request that the Court construe the disputed claims. The parties appeared before the Court for a Markman hearing, after both sides agreed that claim construction determinations were necessary to construe certain disputed claims, and that a hearing would benefit the claim construction process.

## I. Principles of Claim Construction

Claim construction is the first step in an infringement or validity analysis because "[o]nly when a claim is properly understood can a determination be made whether the claim 'reads on'

an accused device or method, or whether the prior art anticipates and/or renders obvious the claimed invention." <u>Amazon.com, Inc. v. Barnesandnoble.com, Inc.</u>, 239 F.3d 1343, 1351 (Fed. Cir. 2001).[4]

A patent is simply a document that describes the exact scope of an invention to "secure to [the patentee] all to which he is entitled [and] to apprise the public of what is still open to them." <u>Markman v. Westview Instruments, Inc.</u>, 517 U.S. 370, 373, 116 S.Ct. 1384, 134 L.Ed.2d 577 (1996)(citations omitted). By statute, a patent consists of two generic elements: one or more "claims", which "particularly poin[t] out and distinctly clai[m] the subject matter which the applicant regards as his invention," and the "specification", which describes the invention "in such full, clear, concise and exact terms as to enable any person skilled in the art...to make and use the same." <u>Id.</u> (citing 35 U.S.C. § 112). "It is a 'bedrock principle' of patent law", the Federal Circuit, oracle of patent law, has written, "that 'the claims of a patent define the invention to which the patentee is entitled the right to exclude.'" <u>Phillips v. AWH Corp.</u>, 415 F.3d 1303, 1312 (Fed.Cir. 2005)(en banc)(citation omitted). The goal of claim construction, then, is to give proper meaning and scope to

_____

[4] In determining whether a patent has been infringed, the Court must conduct a two-step analysis. "First, the court determines the scope and meaning of the patent claims asserted, and then the properly construed claims are compared to the allegedly infringing device." <u>Cybor Corp. v. Fas Techs.</u>, 138 F.3d 1448, 1454 (Fed. Cir. 1998) (citations omitted).

claim language by giving claim terms their ordinary and customary meanings (a daunting responsibility in the arcane world of patent-speak), according to the customary understanding of an artisan of ordinary skill at the time of the invention.  See id. at 1312-13 ("the person of ordinary skill in the art is deemed to read the claim term not only in the context of the particular claim in which the disputed term appears, but in the context of the entire patent, including the specification"); see also Abtox, Inc. v. Exitron Corp., 122 F.3d 1019, 1023 (Fed. Cir. 1997).

There is "no magic formula or catechism for conducting claim construction."  Phillips, 415 F.3d at 1324.  However, the Federal Circuit Court of Appeals has developed some general principles:

> When construing claims, the claims and the rest of the patent, along with the patent's prosecution history (together, the intrinsic evidence of the meaning of the claims) are the primary resources; while helpful, extrinsic sources like dictionaries and expert testimony cannot overcome more persuasive intrinsic evidence.

Finisar Corp. v. The DIRECTV Group, Inc., 523 F.3d 1323, 1328 (Fed.Cir. 2008) (citation omitted).

Proper claim construction turns on the differing roles the Federal Circuit assigns to the specification's written description and claims: "Specifications teach.  Claims claim."  SRI Int'l v. Matushita Elec. Corp., 775 F.2d 1107, 1121 n.14 (Fed.Cir. 1995) (en banc); see also Markman v. Westview Instr., Inc., 52 F.3d 967, 980 (Fed.Cir. 1995)(en banc)("The written description part of the

specification itself does not delimit the right to exclude.  That is the function and purpose of claims.")  So the claims become central to patent power.

## A.  Claims

Under 35 U.S.C. § 112, a patent applicant must define and distinctively claim the subject matter of the invention.  Like a deed to real property, "[i]t is the claim[s] that set[] the metes and bounds of the invention entitled to the protection of the patent system."  Zenith Lab. v. Bristol-Myers Squibb Co., 19 F.3d 1418, 1424 (Fed. Cir. 1994).  "[T]he construction of a patent, including terms of art within its claim," is a matter of law and therefore "exclusively within the province of the court."  Markman v. Westview Instruments, 517 U.S. 370, 372 (1996), aff'd, 517 U.S. 370 (1996).

Claim construction must start with the language of the claims themselves.  Vitronics Corp. v. Conceptronic, Inc., 90 F.3d 1576, 1582 (Fed.Cir. 1996); see also Digital Bometrics, Inc. v. Identix, Inc., 149 F.3d 1335, 1344 (Fed. Cir. 1998)("The actual words of the claim are the controlling focus.")(citation omitted); see also Renishaw PLC v. Marposs Societa' per Azioni, 158 F.3d 1243, 1248 (Fed. Cir. 1998)(claim construction "begins and ends in all cases with the actual words of the claim").  The Court construes the claims objectively, without reference to the accused product (only terms that are in dispute are construed).  Vivid Techs., Inc. v.

American Science & Eng'g, Inc., 200 F.3d 795, 803 (Fed. Cir. 1999).

"[T]he words of a claim 'are generally given their ordinary and customary meaning.'" Phillips, 415 F.3d at 1312 (quoting Vitronics, 90 F.3d at 1582).[5] The ordinary rules of grammar and syntax apply. In re Hyatt, 708 F.2d 712, 714 (Fed.Cir. 1983).

## B. Specification

But the claims "must be read in view of the specification, of which they are a part." Markman v. Westview Instruments, Inc., 52 F.3d 967, 979 (Fed.Cir. 1995), aff'd 517 U.S. 370, 116 S.Ct. 1384, 134 L.Ed.2d 577 (1996). The specification is "'the primary basis for construing the claims.'" Phillips, 415 F.3d at 1315 (quoting Standard Oil Co. v. Am. Cyanamid Co., 774 F.2d 448, 452 (Fed.Cir. 1985)). "The close kinship between the [specification] and the claims is enforced by the statutory requirement that the specification describe the claimed invention in 'full, clear, concise, and exact terms.'" Id. at 1316 (quoting 35 U.S.C. § 112). Once again, the Federal Circuit has explained:

> Ultimately, the interpretation to be given a term can only be determined and confirmed with a full understanding of what the inventors actually invented and

---

[5] "[T]he ordinary and customary meaning of a claim term is the meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention...as of the effective filing date of the patent application." Id. at 1313 (citation omitted). The perspective of a person of ordinary skill in the art is "based on the well-settled understanding that inventors are typically persons skilled in the field of the invention and that patents are addressed to be read by others of skill in the pertinent art." Id. (citations omitted).

> intended to envelop with the claim. The construction
> that stays true to the claim language and most naturally
> aligns with the patent's description of the invention
> will be, in the end, the correct construction.

Id. (citation omitted). If there is a dispute about the meaning of a claim term, the Federal Circuit teaches that the specification presents "the single best guide to the meaning of the disputed term." Vitronics, 90 F.3d at 1582. "[T]he purposes of the specification are to teach and enable those of skill in the art to make and use the invention and to provide a best mode for doing so." Phillips, 415 F.3d at 1323. It is the interpretative key when dispute arises.

On the other hand, the Court must be mindful of another, seemingly conflicting, but likewise well-settled rule: "while proper claim construction requires an examination of the written description and relevant prosecution history to determine the meaning of claim limitations, additional limitations may not be read into the claims."[6] Storage Tech. Corp. v. Cisco Sys., Inc.,

---

[6] Stated another way, the Court ought not ordinarily read a limitation into a claim from the specification:

> [The Federal Circuit Court of Appeals] has consistently
> adhered to the proposition that courts cannot alter
> what the patentee has chosen to claim as his invention,
> that limitations appearing in the specification will
> not be read into claims, and that interpreting what is
> *meant* by a word *in* a claim is not to be confused with
> adding an extraneous limitation appearing in the
> specification, which is improper.

Laitram Corp. v. NEC Corp., 163 F.3d 1342, 1348 (Fed. Cir. 1998) (citations omitted, emphasis in original); accord KCJ Corp. v.

329 F.3d 823, 831 (Fed. Cir. 2003); see also In re Donaldson Co., 16 F.3d 1189, 1195 (Fed. Cir. 1994) (noting the "general claim construction principle that limitations found only in the specification of a patent or patent application should not be imported or read into a claim.").[7]  It is against this doctrinal tapestry the Court must remain ever-mindful of the touchstone of claim construction: "understanding how a person of ordinary skill in the art would understand the claim terms."  Phillips, 415 F.3d at 1323.

_____

Kinetic Concepts, Inc., 223 F.3d 1351, 1356 (Fed. Cir. 2000) ("[A]lthough the specification may well indicate that certain embodiments are preferred, particular embodiments appearing in a specification will not be read into the claims when the claim language is broader than such embodiments.") (quotation omitted)

[7] A claim, however, may not be read in a vacuum, but instead must be given proper meaning and scope in light of the patent's other claims, its specification, and its prosecution history. Phillips, 415 F.3d at 1314 ("a person of ordinary skill in the art is deemed to read the claim term not only in the context of the particular claim in which the disputed term appears, but in the context of the entire patent, including the specification"). This rule derives from the fact that claims do not stand alone but rather "are part of 'a fully integrated written instrument,' consisting principally of specification that concludes with the claims." Id. at 1315 (quoting Markman v. Westview Instruments, Inc., 52 F.3d 967, 978 (Fed. Cir. 1995)(en banc)). "The close kinship between the written description and the claims is enforced by the statutory requirement that the specification describes the claimed invention in 'full, clear, concise, and exact terms.'" Phillips, 415 F.3d at 1316 (quoting 35 U.S.C. § 112, ¶1). Indeed, the Federal Circuit has also emphasized the primacy of the specification in claim construction analysis, noting that it is "[u]sually...dispositive [and] is the single best guide to the meaning of a disputed term." Id. at 1315.

## C. Prosecution History

The Court reckons with one more component of intrinsic evidence, the patent's prosecution history, when it is in evidence. Phillips, 415 F.3d at 1317. The prosecution history consists of the record of the patent before the United States Patent and Trademark Office ("PTO"); it includes the prior art cited during the examination of the patent.

Because the prosecution history "often lacks the clarity of the specification", it is often "less useful for claim construction purposes." Id. The prosecution history may not be used to "enlarge, diminish or vary the limitations in the claims." Markman, 52 F.3d at 980. Nonetheless, the Federal Circuit explains the utility of consulting the prosecution history in claim construction:

> [T]he prosecution history can often inform the meaning of the claim language by demonstrating how the inventor understood the invention and whether the inventor limited the invention in the course of prosecution, making the claim scope narrower than it would otherwise be.

Vitronics, 90 F.3d at 1582-83; see also Chimie v. PPG Indus., Inc., 402 F.3d 1371, 1384 (Fed. Cir. 2005)("The purpose of consulting the prosecution history in construing a claim is to 'exclude any interpretation that was disclaimed during prosecution.'") (quotations omitted).

## D. Extrinsic Evidence

The claims, the specification and the patent's prosecution

history comprise the "intrinsic" evidence of the meaning of the claim terms, and the most relevant and important evidence for construing a patent. Vitronics, 90 F.3d at 1582. Less significant in determining the meaning of claim terms is extrinsic evidence; "evidence [that] is external to the patent and file history, such as expert testimony, inventor testimony, dictionaries, and technical treatises and articles." Id. at 1584. While the Court has discretion to admit extrinsic evidence, the Federal Circuit cautions that it is improper to rely on extrinsic evidence when an analysis of intrinsic evidence alone resolves any ambiguity of disputed terms. Id. at 1583; see also Ga.-Pac. Corp. v. U.S. Gypsum Co., 195 F.3d 1322, 1331 (Fed.Cir. 1999)("[W]hen intrinsic evidence is unambiguous, it is improper for the court to rely on extrinsic evidence to contradict the meaning of the claims.") (citations omitted).

Although it may be useful, the Federal Circuit has cautioned against the use of extrinsic evidence during claim construction because this type of evidence "is unlikely to result in a reliable interpretation of patent claim scope unless considered in the context of intrinsic evidence." Ga.-Pac. Corp., 195 F.3d at 1319. The Court is permitted to admit and use extrinsic evidence in its discretion, as long as it is mindful that intrinsic evidence is paramount.

## II. The Disputed Claim Terms

*Phillips* teaches that words should generally be given their ordinary and customary meaning, particularly from the vantage point of a person of ordinary skill in the art. 415 F.3d at 1313. (This provides the objective baseline from which claim construction should begin. *Id.*)

Based on the parties' written submissions, and as clarified at the Court's Markman hearing, seven claim terms are at issue for construction. The Court analyzes each disputed claim term in turn.

### 1. "game board"

| Plaintiff's Construction | Defendants' Construction |
|---|---|
| A structure having a surface that can support one or more game pieces | A structure that includes a playing surface bounded by a rectangular frame or raised periphery, and which is divided into spaces that are arranged in rows and columns that are parallel to the four sides of the frame |

### a. Innovention's Proposed Construction

Innovention insists that there is no reason why its intentional use of the broad generic term "game board" as used in the claims should have the highly restricted meaning the defendants propose.[8] It further suggests that the defendants improperly

---

[8] Innovention asserts that the construction of "game board" cannot include "the frame or raised periphery" and "divided into spaces that are arranged in rows and columns" features, because these are distinct limitations added by claims that further define "game board", citing (by way of example) claims 14, 23, 25, 30, 39, and 40.

propose to read in features of "four sides" and "rectangular frame" from the '242 patent's preferred embodiments, contrary to principles of claim construction, as well as contrary to the '242 patent's explicit assertion that features of the preferred embodiments are not claim limitations; the specification provides that:

> The foregoing embodiments are presented by way of example only; the scope of the present invention is to be limited only by the following claims.

b. Defendants' Proposed Construction

The defendants insist that the very function of the '242 patent depends on the game board having both a playing surface, a bounding frame, and a grid of rows and columns. The defendants point to various claims, including Claim 39, to support its proposed construction that specifies that "spaces" on the "game board" must be laid out in parallel rows and columns, like a chess board or a checker board.

As to the plaintiff's argument that the defendants impermissibly attempt to add features that are added by claims that further define "game board", the defendants urge the Court to reject the plaintiff's attempt to invoke the doctrine of claim differentiation,[9] contending that the doctrine of claim

---

[9] "[C]laim differentiation...creates a presumption that each claim in a patent has a different scope." Kraft Foods, Inc. v. Int'l Trading Co., 203 F.3d 1362, 1368 (Fed. Cir. 2000) (noting

14

differentiation is overcome when there is powerful evidence to the contrary.  See Anderson Corp. v. Fiber Composites, LLC, 474 F.3d 1361, 1370 (Fed. Cir. 2007).  The Federal Circuit, the defendants insist, has determined that "the written description and prosecution history overcome any presumption arising from the doctrine of claim differentiation."  See Kraft Foods, 203 F.3d 1362 at 1368.

c.  The Court's Construction

The term "game board" appears in many of the '242 patent's claims.  Claim 15, which is representative of many of the asserted claims with respect to the term "game board", discloses "A game comprising: a game board having a playing surface and one or more receptacles for holding electronic components...."  The parties agree that the claim language itself commands that a "game board" has a "playing surface."  Their dispute lies in to what extent the Court should read in other claim language and features present in a preferred embodiment into the otherwise simple phrase "game board."  Indeed, the defendants insist that the 242's "game board" be rectangular, divided into rows and columns, and contain a raised periphery framing the "game board."  None of these features, however, are commanded by the generic phrase "game board" or the contextual claim language; the defendants have not convinced the

_____

that doctrine of claim differentiation creates a rebuttable presumption that each claim in a patent has a different scope).

Court that it must go beyond the ordinary meaning of "game board" as disclosed in the claims. If the features the defendants seek to import into "game board" were intrinsically part of the term itself, further claim language would be redundant.[10] The Court agrees with the reasoning supported by the plaintiffs' posited construction: Like in <u>Phillips</u>, the Federal Circuit determined that the use of "steel baffles" means baffles are not inherently made of steel. 415 F.3d 1303, 1312 (Fed. Cir. 2005)(en banc).

The language of the claims and the principle of claim differentiation (which has not been rebutted) favors the plaintiffs' construction of the term "game board", albeit slightly modified, based on the claim language that calls for "a game board having a playing surface <u>and</u> a cavity [or one or more receptacles] for holding electronic components." <u>See</u>, <u>e.g.</u>, Claims 1 and 15 (emphasis added). The Court determines that "game board" as taught by the '242 patent simply means: "A structure having a playing surface that can support game pieces and electronic components." While the figures of a preferred embodiment of the patent show a rectangular game board, there is nothing in the claim language restricting the game board to that particular shape, even separate language in other claims disclosing "a checkerboard-style game

---

[10] The defendants' posited definition, which calls for a "frame" and "raised periphery" as well as being "divided into spaces arranged in rows in columns", contains limitations not inherent in the ordinary meaning of "game board" and would also render redundant other claim language.

board"; again, the Court relies on the "steel baffles" example of
Phillips.    Finally,  the  Court  also  declines  the  defendants'
invitation  to  read  the  preferred  embodiment  into  the  claim
language.

 2. **"space"** or **"spaces"**

| Plaintiff's Construction | Defendants' Construction |
|---|---|
| A location on a game board that can be occupied by a game piece. | Grid-like areas, laid out in rows and columns, on the upper, playing surface of the game board where playing pieces, not lasers, are moved in turn. |

 a.  Innovention's Proposed Construction

Innovention urges the Court to reject the defendants' proposed
construction as improperly attempting to read in features of the
'242 patent's preferred embodiments into the claim language.

 b.  Defendants' Proposed Construction

The defendants appear to concede in their briefs that "every
time the inventors used the word "spaces", they used it to mean a
location on the game board where the pieces may be located during
game play.

 c.  The Court's Construction

Based on the claim language, and the ordinary meaning of what
is clearly a structural feature that inherently defines a location,
the Court finds that "space" or "spaces" are simply "[a location
or] locations on the playing surface of the game board that can be

occupied by one of the game pieces." The Court declines, as it did in construing "game board", to read in limitations not inherent in the ordinary meaning of the term "space." This is most consistent with the understanding of how an ordinary person skilled in the art would understand "spaces" as they relate to board games. Indeed, the Court finds that the claims themselves sufficiently define the term "space" (Claim 15, for example, teaches "...the playing surface being segmented into a plurality of spaces, each defining a location that can be occupied by one of the game pieces"). Accordingly, a "space" or "spaces" are defined as: "A location [or locations] that can be occupied by one of the game pieces."

3. **"game piece"**

| Plaintiff's Construction | Defendants' Construction |
|---|---|
| A structure that can be placed on a game board. | At least a mirrored and non-mirrored piece that the player moves from space to space on the surface of the board game during the course of game playing, that is capable of being hit by one of two laser beams emanating from two laser sources permanently mounted to the game board; all game pieces are movable during play. |

a. Innoventions' Proposed Construction

Innovention contends that "game piece" is part of the apparatus claims (claims directed to a "board game") and, therefore, the temporal limitations that the defendants would have the Court impose (that is, "moves from space to space" "during the course of game playing", and "movable during play") are inapplicable to a structural item such as "game piece", which is

employed in all of the 52 apparatus claims, as well as the two method claims (claims 39 and 40). Innovention asserts that it is illogical to define "game piece" to require "laser sources permanently mounted to the game board." (Indeed, Innovention notes that the defendants are attempting to create a noninfringement argument through their construction of "game piece" because the accused Laser Battle game houses its laser sources in "Laser Gun" game pieces.) Innovention again asserts a patentee's mantra: that the defendants improperly try to read limitations from the specification into the claims.

     b.  Defendants' Proposed Construction

The defendants counter that Innovention uses neither intrinsic nor extrinsic evidence to support its asserted construction of "game piece." The defendants rely on the '242 patent's specification and prosecution history to support their proposed construction: the claims, say defendants, recite game pieces as having a base with a periphery and under surface and, during the prosecution of the '242 patent, Innovention specifically stated that its game pieces differed from prior art cited by the Examiner because some game pieces are mirrored, while others are not mirrored.

     c.  The Court's Construction

Based on the language of the claims, the specification, and the prosecution history, the Court adopts a slightly modified

construction, and defines "game piece" as "A mirrored or non-mirrored structure that can be placed on the game board and moved by the players during the course of game playing." The mirrored/non-mirrored feature of "game pieces" was relevant in the prosecution history of the patent and is clearly supported in the claim language.[11]

### 4. "cavity" or "cavity for holding electronic components"

| Plaintiff's Construction | Defendants' Construction |
| --- | --- |
| A hollow area within a structure. | A formation in the underside of the raised periphery surrounding the game board, not on the playing surface, that holds the batteries, wires, and/or two lasers, not used for holding playing pieces. |

### a. Innovention's Proposed Construction

Innovention does not offer much to advance its argument that

---

[11] The defendants' attempt to incorporate features extrinsic to the "game pieces" themselves is rejected: a person of ordinary skill in the art would not understand "game piece" to be "capable of being hit by one of two lasers emanating from two laser sources permanently mounted to the game board." These limitations are outside the ordinary meaning of the term "game piece" and unlike the mirrored/non-mirrored feature, are not called for by the prosecution history. Moreover, the defendants' proposal that a "game piece" is something the "player moves from space to space" is contradicted by the claim language or the language of the specification both of which permit (in describing the method for playing the game) "game pieces" to be moved either from space to space or rotated in place (so that the player may position the mirror to deflect the laser). See Claim 39 ("...alternating turns, each turn comprising moving, either a translation or a rotation, a piece followed by activation of a laser...").

"cavity" should be construed so broadly. It simply notes that "cavity" is distinct from "game piece" and is cited in claim 1, which provides that:

> The invention claimed is:
> 1.  A board game, comprising:
> a game board having a playing surface and a
> cavity for holding electronic components.

b.  Defendants' Proposed Construction

The defendants insist that their proposed construction of "cavity" is consistent with the claim language, as well as the specification and preferred embodiment's (Figure 5's) emphasis on the importance of the raised border, which has battery compartments and wiring that interconnects a battery and lasers. The defendants say that the invention differentiates "cavity" from "space" because the space on the surface of the game board is not illustrated or described as being configured or dimensioned to hold battery compartments or wiring. The defendants also point out that "cavity" and "space" are used in close proximity to each other within the same claims, which makes clear that the terms must be construed as having different meanings.

c.  The Court's Construction

The "cavity" limitation appears in independent claims 1 and 25, which specify only that the "cavity" is "for holding electronic components" and further suggests that it is located on the game board. See Claim 1 ("A board game, comprising: a game board having

a playing surface and a cavity for holding electronic components.")
A person of ordinary skill in the art would agree with the ordinary
meaning of the term "cavity" that it is something, as defined by
the claims, that holds electronic components.  However, that fails
to fully define what "cavity" means in the context of the
invention.  Accordingly, the Court is informed by the specification
and the preferred embodiment.[12]  The Court finds the plaintiff's
proposed construction is too broad and the defendants' proposed
construction is most consistent with the claim language and the
specification, with the exception that the defendants' asserted
limitations "not used for holding playing pieces" is unnecessary
and fails to elucidate the meaning of "cavity."  Accordingly, the
Court adopts a modified version of the defendants' proposed
construction of "cavity": "A hollow space in the raised periphery
surrounding the playing surface that holds batteries and wires."

---

[12] The specification and preferred embodiment (Figure 5)
suggest a possible use for "cavity":

> lower section 13 of game board 11 reveals cavity 26
> that is defined by the sections 16, 17, 18 of raised
> boarder 15.  Cavity 26 provides one or more battery
> compartments 27.  The cavity 26 can be used for
> containing wiring 28 that interconnects a battery (or
> batteries) and lasers 21, 22 so that power supplied by
> a batter that occupies battery compartment 27 can be
> used to power the lasers 21, 22.

## 5. "receptacle" or "receptacles"

| Plaintiff's Construction | Defendants' Construction |
|---|---|
| A physical structure that can receive, contain, or hold something | Formations in the raised periphery surrounding the game board, not on the playing surface, used for mounting batteries, wires, and/or laser devices, and not used for holding playing pieces |

a. Innoventions' Proposed Construction

Innovention agrees with the defendants that the ordinary meaning of "receptacle" connotes that it is a structure that receives or holds something. However, Innovention asserts that, even though "space" and "receptacle" are distinct concepts, the '242 patent does not preclude that a "receptacle" could be located at a "space" on the game board. In support of this assertion, Innovention points to claim 26, which teaches that "each space provides a recess that is receptive of a game piece." Innovention contends that "[t]here is strong linguistic and structural relationship between a 'receptacle' and a 'recess that is receptive' of some other item (such as a 'game piece'), which still exists if the 'recess' (i.e., a "receptacle") happens to be located at a 'space' on the 'game board.'"[13]

_____

[13] Thus, Innovention contends that, because the claims contemplate that a space may be recessed, that a recessed space may receive or be receptive of a game piece, and that a game piece may include electronic components, it follows that a "recess" existing at a "space" must be capable of "holding electronic components."

b. Defendants' Proposed Construction

The defendants assert that even Innovention's proposed constructions of "space" and "receptacle" do not strongly support the view that a "space" could be a "receptacle", unless the Court adopts the strained and unnatural reading that requires a space on the game board to "receive, hold, or contain" the game piece, which (say defendants) is an interpretation that is contrary to the specification. The defendants also point out that the terms "spaces" and "receptacle" are used in close proximity, which creates an inference that they have different meanings.

c. The Court's Construction

Claim 15 teaches that the invention is:

> A game comprising:
> a game board having a playing surface and one
> or more receptacles for holding electronic
> components.

Based on the scarce claim language (and clarified by the specification, and the drawings that illustrate the point), it is clear that the patentee differentiates between "spaces" and "receptacle" (while "receptacle" and "cavity" are similar in their ordinary meanings and as claimed). Accordingly, as it did with "cavity", the Court adopts a slightly modified version of the defendants' proposed construction of "receptacles": "Formations in the raised periphery surrounding the playing surface that contain batteries and wires."

6. "mounted"

| Plaintiff's Construction | Defendants' Construction |
|---|---|
| Set or arranged on something for use | Fixedly attached to |

a. Innovention's Proposed Construction

Innovention insists that the Court must look to the claims only in defining the term "mounted" because the specification provides that the embodiments are provided only by way of example. In any event, Innovention insists, the defendants cannot deny that the Laser Gun and Target Tower game pieces of the accused game are "mounted" to their game board.

b. The Defendants' Proposed Construction

The defendants insist that their proposed construction of "mounted" is supported by the claim language, which is given life by the specification and preferred embodiments. The defendants also contend that the Examiner noted that mounting the light source on the game board was a feature that distinguished the '242 patent from prior art.

c. The Court's Construction

Claims 15 and 25 teach that there are two beam emitting devices "mounted to the game board." The Court finds that the claim language and the specification favor the defendants' posited construction. Moreover, the Court finds that the term should be given its ordinary meaning, in light of the context of the claims

25

and specification; accordingly, the Court adopts the defendants'
proposed construction defines "mounted" as "fixedly attached to."

7. **"control button" or "first [or second] control button that
enables a first [or second] player to activate or deactivate the
first beam emitting device"**

| Plaintiff's Construction | Defendants' Construction |
|---|---|
| A "control button" is a structure that can control the operation of a device. In the context of the patent-in-suit, the "control button" controls the operation of a beam emitting device (for example, a laser) | The phrase "first [or second] control button that enables a first [or second] player to activate and deactivate the first beam emitting device" is a control button means, that is permanently mounted to the raised periphery surrounding the game board adjacent to the first [or second] beam emitting device, which is likewise permanently mounted to the game board, for enabling a first [or second] player to activate and deactivate the first beam emitting device |

    a.   Innoventions' Proposed Construction

Innovention insists that its invention does not require a
raised periphery surrounding the game board, which means that the
claims do not require that the "control buttons" be permanently
mounted to such a structure. Innovention asserts that Claim 13
specifically locates the "control buttons" on the "game board" but
that the claims themselves imply that claims 1, 15, and 25 require
no such further limitation. Finally, Innovention contends that the
defendants' reliance on the prosecution history is misplaced
because Innovention did not raise any distinction as to the
*location* of the "control buttons."

b.  Defendants' Proposed Construction

The defendants contend that Innovention's proposed construction fails to account for the plain language of the term, the specification, and explicit statements made to distinguish the invention from prior art.  The defendants point out that the claims themselves do not recite the location of the control button; instead, the claims specify only the function that the control button performs.  However, the defendants insist that, when read in their entirety, the language of the claims clarifies the location of the control button.[14]  The plain meaning of the claims, say defendants, is also supported by the specification, which states that the control buttons (designated by numerals 19 and 20) are positioned at opposite ends of the raised periphery of the game board, as shown in Figure 1.  Finally, the defendants point to the prosecution history: the defendants insist that, to overcome prior art, Innovention argued that the prior art did not describe any laser control buttons on the game board.

c.  The Court's Proposed Construction

As used in the claims, "control buttons" are used to activate and deactivate beam emitting devices -- the latter are taught by

---

[14] The defendants say that it logically follows from the language of Claim 1, which recites that the first and second beam emitting devices are mounted to the game board and that the first and second control buttons enable players to activate and deactivate the beam emitting devices, that the control buttons must also be mounted on the game board.

the claims as being mounted to the game board. The Court finds that an ordinary person skilled in the art of laser board games would be sufficiently apprised of the meaning of "control button" from the ordinary meaning of the term and its contextual use in the claims. Accordingly, the "control button" is simply "A structure that activates a beam emitting device."

### III. Conclusion

For the reasons set forth above, the disputed claim terms[15] are construed as having the following meanings:

**"game board"** means "A structure having a playing surface that can support game pieces and electronic components."

**"space" or "spaces"** means "A location [or locations] that can be occupied by one of the game pieces."

**"game piece"** means "A mirrored or non-mirrored structure that can be placed on the game board and moved by the players during the course of game playing."

**"cavity for holding electronic components"** means "A hollow space in the raised periphery surrounding the playing surface that holds batteries and wires."

**"receptacles"** mean "Formations in the raised periphery surrounding the playing surface that contain batteries and wires."

**"mounted"** means "fixedly attached to."

**"control button"** means "A structure that activates a beam

_____

[15] Innovention proposes that the Court define "followed by activation of a laser" to mean "causing the emission of a laser beam from a beam emitting device, including (but not limited to) through the operation of a "control button." Because the defendants do not appear to dispute Innovention's proposed construction, the Court assumes that there is no dispute as to the meaning of "followed by activation of a laser" and therefore no reason to engage in claim construction for this term.

emitting device."

New Orleans, Louisiana, May 21, 2009.

_____

MARTIN L. C. FELDMAN
UNITED STATES DISTRICT JUDGE