**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF LOUISIANA**

INNOVENTION TOYS, LLC,                          CIVIL ACTION
    **Plaintiff**

VERSUS                                          No.  07-6510

MGA ENTERTAINMENT, INC., et al.,                SECTION "E"
    **Defendants**

### ORDER AND REASONS

Before the Court are two motions.  The first motion, filed by defendant MGA Entertainment, Inc. ("MGA"), requests the Court to find that MGA's infringement of the '242 patent[1] *was not* willful under 35 U.S.C. § 284.[2]  The second motion, filed by plaintiff Innovention Toys, LLC ("Innovention"), requests the Court to (1) find that MGA's infringement of the '242 patent *was* willful under 35 U.S.C. § 284; (2) award Innovention enhanced damages, attorneys' fees, costs, expert fees, and interest; and (3) enjoin MGA from further infringing the '242 patent.[3]  For the following reasons, MGA's motion is **DENIED** and Innovention's motion is **GRANTED IN PART, DENIED IN PART** and **DEFERRED IN PART** as set forth below.

### *Background*

The above-captioned matter concerns infringement and validity of a patent for a chess-like board game in which opposing players shoot a laser beam at mirrored game pieces in order to reflect the beam in an attempt to strike (and thus eliminate from the

---

[1] U.S. patent no. 7,264,242.  *See* Tr. Exh. 1.

[2] R. Doc. 598.

[3] R. Doc. 602.

1

game) an opponent's key playing piece.  *Innovention Toys, LLC v. MGA Entm't, Inc.*, 665 F.Supp.2d 636, 639 (E.D. La. 2009) (Feldman, J.).[4]  In the more than five years that have passed since Innovention initiated this lawsuit, the parties have engaged in extensive motions practice.  Furthermore, defendants – MGA, Wal-Mart Stores, Inc. ("Wal-Mart"), and Toys "R" Us, Inc. ("Toys 'R' Us") (collectively, "Defendants") – filed an interlocutory appeal to the U.S. Court of Appeals for the Federal Circuit ("Federal Circuit"), discussed *infra*.  As a result, the following procedural history and recitation of evidence introduced at trial is not an exhaustive overview of this case.  Rather, the Court has outlined what is necessary to support its findings that (1) MGA's infringement was willful; (2) Innovention is entitled to treble damages for MGA's willful infringement; (3) this is an exceptional case; (4) Innovention is entitled to attorneys' fees because this is an exceptional case; (5) Innovention is entitled to taxable and non-taxable costs; (6) Innovention is entitled to pre-judgment interest on the $1,573,163.00 damages award at the prime rate, to be compounded annually, calculated from the date infringement began through the date of final judgment; and (7) Innovention is entitled to post-judgment interest pursuant to 28 U.S.C. § 1961.

Dr. Michael Larson ("Larson"), a former professor at Tulane University, and Luke Hooper ("Hooper") and Del Segura ("Segura") (collectively, "the inventors"), two of Larson's former students, invented the light-reflecting board game ("the game")[5] in 2003-

---

[4] This matter was transferred from Section F (Judge Martin L.C. Feldman) to the undersigned on April 4, 2012.  *See* R. Doc. 407.

[5] The inventors originally named the game "Deflexion."  The name was later changed to "Khet" to avoid market confusion with a similarly-named tiddlywinks game.  After the game was redesigned in 2010, Innovention began selling the new version of the game under the name "Khet 2.0."  *See* R. Doc. 583 at pp. 40-41, 117 (Larson).

2004 and produced the game's first mass production mold in the fall of 2004.[6]   On February 14, 2005, and May 11, 2005, the inventors filed provisional patent applications with the U.S. Patent and Trademark Office ("PTO") that teach the game.[7]   The inventors[8] exhibited the game at the February 2005 International Toy Fair in New York City, New York.[9] Later that year, Hurricane Katrina ("Katrina") made landfall in Louisiana on August 29, 2005.  After delays due to Katrina, Innovention started selling the game in October 2005.[10]  Soon thereafter, the game began to receive industry praise.[11]  For example, the game was included in *Wired Magazine*'s December 2005 holiday gift guide, which was published in November 2005.[12]

On December 1, 2005, an MGA employee – Ami Shapiro ("Shapiro")[13] – purchased two copies of Innovention's game and had them shipped to MGA's headquarters at 16300 Rosco Blvd., Suite 150, Van Nuys, California 91406, where he worked.[14]  The original

---

[6] PPE-1; PPE-11; R. Doc. 587 at pp. 28-33, 41-44, 46-56, 61-64; Tr. Exhs. 130, 131, and 133.

[7] The '242 patent claims priority to U.S. Patent Application Serial No. 11,353,863 ("the '863 application"), which was filed on February 13, 2006.  The '863 application claims priority to Provisional Application No. 60/652,533, filed February 14, 2005, and to Provisional Application No. 60/679,821, filed on May 11, 2005.  *See* R. Doc. 483 at p. 13 (pretrial order).

[8] Innovention is a limited liability company ("LLC") organized under the laws of Louisiana.  The inventors are the LLC's members.  R. Doc. 583 at pp. 34-35 (Larson).  The inventors' rights in the '242 patent have been assigned to Innovention.  Tr. Exh. 1.

[9] R. Doc. 583 at pp. 51-57 (Larson); R. Doc. 587 at pp. 71-73.

[10] R. Doc. 583 at pp. 63-64 (Larson).

[11] R. Doc. 583 at pp. 65-66 (Larson).

[12] R. Doc. 583 at pp. 65-66 (Larson); Tr. Exh. 7.

[13] Shapiro was the lead toy designer for MGA's Laser Battle game.  R. Doc. 586 at p. 81 (Shapiro).

[14] R. Doc. 583 at pp. 66-68 (Larson); R. Doc. 586 at pp. 84-85 (Shapiro); Tr. Exhs. 137, 230, 246, 246; PPE-11.

3

packaging for the game was marked with the words "patent pending."[15] After receiving the games, Shapiro kept one copy and sent the other copy to another MGA employee, Alex Fan ("Fan"), in Hong Kong.[16] Upon receipt of the game on December 8, 2005, Fan e-mailed Shapiro. In his e-mail, Fan observed that the game's box was marked "patent pending" and asked which part of the game was patented.[17] No contemporaneous reply e-mail from Shapiro to Fan was produced during discovery or introduced into evidence at trial. When queried about Fan's e-mail during his deposition,[18] Shapiro stated that he could not remember whether he had replied to Fan, but noted that MGA "ha[d], obviously, moved forward" with MGA's laser chess game, Laser Battle.[19]

In February 2006, the inventors returned to the International Toy Fair in New York. At the fair, buyers from Toys "R" Us and Wal-Mart informed the inventors that they liked Innovention's game, but they would not purchase it because they had committed to buy another game "just like" it from an undisclosed supplier.[20] The inventors were unable to obtain any information regarding the other game or its supplier.[21] A few months thereafter some time in the fall of 2006, MGA began retail sales of Laser Battle through Wal-Mart and

---

[15] R. Doc. 583 at p. 76 (Larson); R. Doc. 586, pp. 13-15, 85 (Shapiro); PPE-11.

[16] R. Doc. 586 at p. 84 (Shapiro); Tr. Exh. 246; PPE-11.

[17] R. Doc. 586 at p. 84 (Shapiro); Tr. Exh. 246; PPE-11.

[18] At the time of trial, Shapiro was no longer employed with MGA and was outside the Court's subpoena power. Innovention and Defendants called Shapiro to testify via video deposition. Shapiro's deposition was taken August 14, 2009. R. Doc. 586 at pp. 9-10 (Shapiro).

[19] R. Doc. 586 at p. 86 (Shapiro).

[20] R. Doc. 583 at pp. 78-84 (Larson).

[21] R. Doc. 583 at pp. 83-84 (Larson).

Toys "R" Us.[22]

In August or September 2006, a friend of Larson's purchased five copies of MGA's Laser Battle at retail and shipped them to Larson.[23]  Larson examined Laser Battle and believed it was very "similar" to Innovention's game.[24]  "[R]ight after [the inventors] became aware of the Laser Battle game," the PTO published the '863 application on October 12, 2006.[25]  Counsel for Innovention sent a letter, with a copy of the '863 application enclosed, to Isaac Larian ("Larian"), MGA's CEO, on October 18, 2006.[26]  The letter informed Larian that the application "cover[ed] light-reflecting board games," that Laser Battle was "related to the subject matter and may be covered by at least one claim" of the '863 application, and that Innovention would "aggressively enforce its patent rights as they issue[d]."[27]  MGA did not respond to Innovention's October 18, 2006 letter.[28]

On November 29, 2006, the PTO issued its First Office Action to Innovention in which it rejected certain claims in the pending '863 application as either anticipated by the Swift patent,[29] or as obvious from the Swift patent in view of another prior art reference.[30]  Innovention responded to the PTO on February 27, 2007, by amending the '863 application

---

[22] R. Doc. 483 at p. 14 (pretrial order); R. Doc. 583 at pp. 90-93 (Larson).

[23] R. Doc. 583 at pp. 89-90 (Larson).

[24] R. Doc. 583 at pp. 90-93 (Larson).

[25] R. Doc. 583 at p. 96 (Larson); R. Doc. 483 at p. 13 (pretrial order); Tr. Exh. 90.

[26] R. Doc. 583 at pp. 95-97 (Larson); Tr. Exh. 157.

[27] Tr. Exh. 157.

[28] R. Doc. 583 at p. 106 (Larson).

[29] U.S. Patent No. 5,145,182.

[30] Tr. Exh. 142 at INNOV000141.

so that each of the rejected claims included a new requirement of "movable key pieces."[31] Based on these claim amendments, on May 3, 2007, the PTO agreed to issue the '863 application as a patent.[32]  The '242 patent issued and was published on September 4, 2007.[33]

On October 5, 2007, Innovention initiated the above-captioned lawsuit against MGA and Wal-Mart, alleging that they had infringed and were continuing to infringe the '242 patent by making, using, importing, selling and/or offering for sale products – i.e., Laser Battle – covered by one or more of the '242 patent claims.[34]  Innovention further alleged that MGA's infringement of the '242 patent was willful.[35]  Via a letter to Larian also dated October 5, 2007, Innovention notified MGA that the '242 patent had issued and that Innovention had instituted this lawsuit to enforce its rights under the patent.[36]  While the letter alleged that "MGA's Laser Battle™ game plainly infringe[d] Innovention's '242 patent," Innovention informed MGA that it sought an "amicable resolution," if possible, before Innovention lost sales to MGA for the 2007 holiday season.[37]  The letter further informed Larian that if he did not respond by October 12, 2007, Innovention would "serve the complaint and seek an immediate injunction."[38]

---

[31] Tr. Exh. 142 at INNOV000119 to INNOV000129.

[32] Tr. Exh. 142 at INNOV000101 to INNOV000106.

[33] R. Doc. 483 at p. 13 (pretrial order); R. Doc. 583 at p. 105 (Larson); Tr. Exh. 1.

[34] R. Doc. 1.

[35] R. Doc. 1 at p. 3.

[36] R. Doc. 484 at p. 62-64 (Larson); Tr. Exh. 202.

[37] Tr. Exh. 202.

[38] Tr. Exh. 202.

The parties were unable to amicably resolve the dispute.  Innovention effected service of its original complaint on MGA and Wal-Mart.[39]  Before MGA and Wal-Mart answered, Innovention filed an amended complaint adding Toys "R" Us as a defendant on December 4, 2007.[40]  Defendants answered and counterclaimed, seeking a declaratory judgment that the '242 patent was invalid and unenforceable and that Defendants had not infringed the patent.

Defendants further moved for summary judgment, arguing that the '242 patent was invalid and therefore that Defendants' conduct did not infringe a valid patent.  Innovention cross-moved for summary judgment, arguing that the patent was valid and that Laser Battle infringed the patent.  Prior to ruling on the motions for summary judgment, the Court held a *Markman*[41] hearing on May 13, 2009,[42] and construed the disputed claim interpretations.[43]  Applying the claim constructions set forth in the *Markman* order, the Court determined that MGA's Laser Battle game infringed the '242 patent.  *Innovention*, 665 F.Supp.2d at 647.  The Court further concluded that the '242 patent was valid because the claims of the '242 patent were not anticipated by the prior art references and were not rendered obvious in light of the prior art references.  *Innovention*, 665 F.Supp.2d at 647-55.  With respect to its determination that the patent's claims were not obvious, the Court specifically held that two articles ("the Laser Chess articles") disclosing a computer-based

---

[39] R. Docs. 5 and 6.

[40] R. Doc. 11.

[41] *Markman v. Westview Instruments, Inc.*,  517 U.S. 370 (1996).

[42] R. Docs. 109 and 173.

[43] R. Doc. 110.

laser chess game were not analogous prior art under 35 U.S.C. § 103 and that Defendants had not come forward with any evidence indicating that the level of ordinary skill in the art was greater than that of a layperson.  *Innovention*, 665 F.Supp.2d at 653-54.

Following the Court's October 14, 2009 ruling on the motions for summary judgment, Innovention immediately moved for a permanent injunction to enjoin Defendants from continuing to make, import, sell or offer to sell MGA's Laser Battle game. The Court granted Innovention's motion on January 13, 2010, reasoning in part that "MGA . . . used its superior market power to deny Innovention the opportunity to sell its Khet game through retailers like Wal-Mart and Toys 'R' Us, which only sell one laser strategy board game," – i.e., MGA's Laser Battle.[44]

On February 11, 2010, Defendants filed a notice of appeal challenging the Court's order granting a permanent injunction, as well as the underlying rulings in which it construed certain claim terms and determined that the asserted claims of the '242 patent were valid and infringed.  The Federal Circuit affirmed the Court's finding that Laser Battle infringed the '242 patent.[45]  *See Innovention Toys, LLC v. MGA Entm't, Inc.*, 637 F.3d 1314, 1319-20 (Fed. Cir. 2011).  The Federal Circuit further determined that "the district court clearly erred in several of the factual findings underlying its obviousness analysis." *Innovention*, 637 F.3d at 1321.  The Federal Circuit found that, because the Court erred in determining that the Laser Chess articles were not prior analogous art, "the district court failed to properly consider the scope and content of the relevant prior art as well as the differences between that art and the claimed invention, including whether one of ordinary

---

[44] R. Doc. 220 at p. 5.

[45] Defendants did not appeal the Court's finding regarding anticipation.

skill in the art would have been motivated to combine the teachings of the Laser Chess references with the Swift patent in light of the standard articulated in *KSR International Co. v. Teleflex, Inc.*, 550 U.S. 398, 127 S.Ct. 1727, 167 L.Ed.2d 705 (2007)." *Innovention*, 637 F.3d at 1323. Thus, the Federal Circuit vacated the Court's ruling with respect to obviousness, and remanded the case for further proceedings on that issue. "[S]hould the district court [on remand] conclude that MGA has made out a *prima facie* case of obviousness based on the Laser Chess articles and the Swift patent," the Federal Circuit instructed, "the court must then determine whether Innovention's secondary considerations overcome MGA's *prima facie* case." *Innovention*, 637 F.3d at 1323.

Consequently, on remand the only issues remaining for trial were whether any claims of the '242 patent were obvious, whether Innovention could establish any evidence of "secondary considerations" proving the claims set forth in the '242 patent were not obvious, whether MGA's infringement was willful, and the amount of Innovention's damages, if any. Those issues were tried to a jury from November 5, 2012, to November 9, 2012.[46] The jury returned a verdict in favor of Innovention, finding that

> (1)   a hypothetical person of ordinary skill in the art relevant to the '242 patent would have a bachelor's degree in mechanical engineering or equivalent experience;
>
> (2)   there are differences between the combination of the prior art and the asserted claims of the '242 patent;
>
> (3)   as to all claims of the '242 patent, it was not highly probable that a person of ordinary skill in the art, as of the date of the invention of the '242 patent, would have had a motivation to combine the teachings of the Laser Chess articles and the Swift patent to create the invention set forth in the claims, and would have had a

---

[46] R. Docs. 566, 571, 572, 573 and 574.

reasonable success in doing so;

(4)     Innovention had established six objective factors relating to nonobviousness;

(5)     it was not highly probable that each claim in the '242 patent would have been obvious to a person having ordinary skill in the art as of the date of the invention of the '242 patent; and

(6)     MGA's infringement of the '242 patent was willful.[47]

The jury awarded Innovention $167,455 in pre-issuance reasonable royalty damages and $1,405,708 in post-issuance lost profit damages.[48]

## *Law and Analysis*

### I.     **Willful Infringement**

At trial, the Court instructed the jury on the legal standard for willful infringement and submitted an interrogatory to the jury asking whether it was "highly probable that MGA's infringement of the '242 patent was willful."[49]   The jury answered "yes" to such interrogatory.[50]   MGA[51] argues that, despite the jury's verdict, the Court should enter judgment that MGA's infringement was not willful.   Innovention counters that the jury properly found MGA's infringement was willful and requests the Court to enter judgment accordingly.   This issue is before the Court for decision because, as explained below, willful

---

[47] R. Doc. 574-3 (jury verdict form).

[48] R. Doc. 574-3 (jury verdict form).

[49] R. Doc. 575 at p. 9 (jury instructions) and R. Doc. 574-3 at p. 12 (jury verdict form).

[50] R. Doc. 574-3 at p. 12 (jury verdict form).

[51] At trial, Wal-Mart and Toys "R" Us moved for judgment as a matter of law that they did not willfully infringe the '242 patent, which Innovention did not oppose.  The Court granted the motion.  R. Doc. 590 at pp. 69-70.  Consequently, the jury was asked only whether MGA's infringement was willful.

infringement is in part a question to law that must be decided by the Court. *See Bard Peripheral Vascular, Inc. v. W.L. Gore & Assoc., Inc.*, 682 F.3d 1003, 1006-07 ("While the ultimate question of willfulness based on an assessment of the second prong of *Seagate* may be a question of fact, *Seagate* also requires a threshold determination of objective recklessness. That determination entails an objective assessment of potential defenses.").

According to the Federal Circuit, "proof of willful infringement permitting enhanced damages requires at least a showing of objective recklessness." *In re Seagate Tech., LLC*, 497 F.3d 1360, 1371 (Fed. Cir. 2007). In order to establish the requisite recklessness, a patentee must satisfy two factors set forth in *Seagate*, and later clarified in *Bard*.[52] *Seagate*, 497 F.3d at 1371; *Bard*, 682 F.3d at 1006-07. First, "a patentee must show by clear and convincing evidence that the infringer acted despite an objectively high likelihood that its actions constituted infringement of a valid patent." *Seagate*, 497 F.3d at 1371. This first, objective prong – though often predicated on underlying mixed questions of law and fact – is ultimately a question of law for the Court and is subject to *de novo* review. *Bard*, 682 F.3d at 1006-07. If this first, objective *Seagate* prong is satisfied, the patentee must satisfy the second, subjective *Seagate* prong by showing that the objectively-defined risk that the alleged infringer's actions constituted infringement of a valid patent was either known, or so obvious that it should have been known, to the accused infringer. *Seagate*, 497 F.3d at 1371. The second, subjective *Seagate* prong is a question of fact to be decided by the jury.

---

[52] Prior the Federal Circuit's 2007 decision in *Seagate*, the "ultimate question of willfulness ha[d] long been treated as a question of fact." *Bard Peripheral Vascular, Inc. v. W.L. Gore & Assoc., Inc.*, 682 F.3d 1003, 1006 (Fed. Cir. 2012) (citation omitted). In *Seagate*, the Federal Circuit set forth the modern, two-step test for proving willful infringement, but recognized that it would be further refined in future caselaw. *Seagate*, 497 F.3d at 1371 ("We leave it to future cases to further develop the application of this standard."). In *Bard*, the Federal Circuit clarified that the first, objective *Seagate* prong is a question of law for the Court, while the second, subjective *Seagate* prong remains a question of fact for the jury. *See Bard*, 682 F.3d at 1008.

*See Bard*, 682 F.3d at 1008.

Following *Seagate*, the Federal Circuit announced that the first, objective prong "tends not to be met where an accused infringer relies on a reasonable defense to a charge of infringement." *Spine Solutions, Inc. v. Medtronic Sofamor Danek USA, Inc.*, 620 F.3d 1305, 1319 (Fed. Cir. 2010). In other words, if an accused infringer has an objectively reasonable defense, it is unlikely that the infringer acted despite an objectively high likelihood that its actions constituted infringement of a valid patent.[53] *See Powell v. Home Depot U.S.A., Inc.*, 663 F.3d 1221, 1236 (Fed. Cir. 2011). In this case, MGA has advanced both invalidity defenses and a non-infringement defense and argues that such defenses were objectively reasonable. Consequently, the Court must review MGA's defenses in light of the first, objective *Seagate* prong and determine whether, as a matter of law, they were or were not objectively reasonable.

In *Bard*, the Federal Circuit provided procedural guidance for courts on how to review the first, objective *Seagate* prong depending on whether a defendant advances defenses that are purely legal, purely factual, or mixed questions of law and fact. "When a defense or noninfringement theory asserted by an infringer is *purely legal* (e.g., claim construction), the objective recklessness of such a theory is a purely legal question to be determined by the judge." *Bard*, 682 F.3d at 1007 (emphasis added). "[W]hen the defense is a question of fact or a mixed question of law and fact [, the judge may] allow the jury to determine the underlying facts relevant to the defense in the first instance, for example, the questions of anticipation or obviousness." *Bard*, 682 F.3d at 1008. Because MGA has

---

[53] As this Court has previously recognized, "[t]he law does not require MGA's defenses to be successful. Rather, the question is whether MGA's defenses are reasonable." R. Doc. 467 at p. 7 (citing *Bard*, 682 F.3d at 1005).

argued throughout this litigation that the '242 patent is obvious, a defense which turns on

underlying facts, the Court submitted interrogatories regarding such facts relating to

obviousness and willful infringement to the jury.[54]

Finally, in order for a defendant to "willfully infringe a patent, the patent must exist

and one must have knowledge of it." *State Indus. v. A.O. Smith Corp.*, 751 F.2d 1226, 1236

(Fed. Cir. 1985) (emphasis removed). The Court will first examine whether MGA had notice

---

[54] Prior to trial, MGA moved for summary judgment that it could not be liable for willful infringement, because, according to MGA, it had relied on reasonable defenses to Innovention's allegations that Laser Battle infringed the '242 patent. *See* R. Doc. 423. Thus, MGA argued that Innovention could not satisfy the first, objective *Seagate* prong, and without satisfying the first prong, Innovention's willful infringement claim failed. The Court examined MGA's allegedly reasonable defenses, and concluded that they turned on mixed questions of fact and law. *See* R. Doc. 467 at p. 5. Noting that the *Bard* Court approved of allowing a jury to determine the underlying facts relevant to an obviousness defense, *Bard*, 682 F.3d at 1008, the Court informed the parties that it would "reserve *Seagate*'s first, objective prong until the parties make a full presentation of the evidence, subject to cross-examination, on the record and the jury has been given an opportunity to resolve any necessary factfinding." *See* R. Doc. 467 at p. 6.

At the time MGA filed its motion for summary judgment regarding willful infringement, the Federal Circuit's decision in *Bard* was less than three months old. As a result, there was no Federal Circuit caselaw reviewing a trial court's post-*Bard* procedure in dividing the duties between the jury and the trial court for determining whether a defendant's infringement was willful. According to the Court's independent research at the time it denied MGA's motion for summary judgment, other federal district courts confronting such post-*Bard* procedural issues indicated they would reserve the first, objective *Seagate* prong until after trial. *See* R. Doc. 467 at p. 5 n.14.

Since the date of the Court's order denying summary judgment, many more federal district courts have likewise decided to reserve the first, objective *Seagate* prong until after a full presentation of the evidence at trial. *See, e.g., Grant Street Grp., Inc. v. Realauction.com, LLC*, 2013 WL 2404074, at *5 (W.D. Pa. May 31, 2013) ("This Court . . . will present any questions of fact necessary to the objective recklessness issue to the jury, the Court will then resolve the legal question of objective recklessness upon the appropriate motion."); *Halo Electronics, Inc. v. Pulse Electronics, Inc.*, 2013 WL 2319145 (D. Utah May 28, 2013) (ruling on the issue of willful infringement as a matter of law after jury returned a verdict finding that the plaintiff "had proven it was highly probable that [the defendant]'s infringement was willful"); *Carnegie Mellon Univ. v. Marvell Tech. Group, Ltd.*, 2012 WL 5417552, at *2 ("The Court finds that there are mixed questions of law and fact in regards to [the jury], insofar as the jury should be presented the evidence to determine the underlying facts relevant to the defenses before this Court rules on the objectiveness prong of willful infringement." (internal quotation marks omitted, brackets omitted)); *Illinois Tool Works, Inc. v. MOC Prods. Co., Inc.*, ___ F.Supp.2d ___, 2012 WL 8169898, at *5 (E.D. Cal. Oct. 15, 2012) ("Here, to decide the objective prong of willfulness, the Court will need to evaluate [the defendant's] potential defenses of anticipation and obviousness, both of which turn either in whole or in part on factual questions. . . . Delaying a ruling until after a jury verdict in the infringement proceedings is consistent with *Bard* and is more likely to produce an accurate and informed ruling.").

of the '242 patent as soon as it issued on September 4, 2007.[55]  Then, the Court will turn to

its analysis of the first, objective *Seagate* prong and the second, subjective *Seagate* prong.

### A.      MGA's Notice of the '242 Patent

MGA argues that it had no notice of the '242 patent – which issued on September

4, 2007 – until Innovention initiated this lawsuit on October 5, 2007, and informed MGA

of the lawsuit via a letter dated that same day.  Consequently, MGA asserts, it had no

knowledge the patent had issued and therefore its infringement was not willful.[56]  Whether

MGA had notice of the '242 patent from the date of issuance is a question of fact, which the

jury answered in the affirmative by awarding Innovention damages from the date the patent

issued and finding that MGA's infringement was willful.[57]   *Coupe v. Royer*, 155 U.S. 565,

585 (1895) (stating that notice is a question of fact); *Kinetic Concepts, Inc. v. Smith &

Nephew, Inc.*, 688 F.3d 1342, 1359 (Fed. Cir. 2012) ("[F]actual findings in support of the

general verdict are implied when a verdict form under Rule 49(b) is used.").  Thus,

Innovention responds that the "jury's findings, including all implied findings in support of

the verdict, are founded on substantial evidence, and thus MGA's attempt to re-argue the

facts [regarding MGA's notice of the '242 patent] necessarily fails."[58]

A review of the evidence shows that MGA had knowledge of the claims that were

ultimately covered by the '242 patent on the date the '242 patent issued.  Innovention sent

MGA a copy of the '863 application – which was published October 12, 2006 – as an

---

[55] The parties do not dispute that the patent issued on September 4, 2007.

[56] R. Doc. 617 at p. 11 (footnote omitted).

[57] R. Doc. 574-3 at p. 12 (jury verdict form question nos. 7 and 8).

[58] R. Doc. 605 at p. 15.

enclosure to its October 18, 2006 letter to Larian.  The Court previously concluded as a matter of law that the claims which issued in the '242 patent are "substantially identical" to the claims covered in the '863 application.[59]  Consequently, the published '863 application, of which MGA had a copy, provided notice of the claims in the ultimately issued '242 patent.  As a result, MGA was already on notice of the claims covered by the '242 patent when the patent issued on September 4, 2007.  *See K-TEC v. Vita-Mix Corp.*, 696 F.3d 1364, 1378-79 (Fed. Cir. 2012) (finding that infringer had notice of a patent when it issued in December 2005 because infringer had notice of the patent's parent patent in March 2005 and notice of the patent's pending application in late October 2005, and affirming a finding of willful infringement); *Nat'l Presto Indus., Inc. v. West Bend Co.*, 76 F.3d 1185, 1193 (Fed. Cir. 1996) (affirming judgment of willfulness despite patentee filing suit on the day patent issued because infringer had "several months' advance notice" of patentee's application); *Tomita Techs. USA, LLC v. Nintendo Co., Ltd.*, 2012 WL 2524770, at *10 (S.D.N.Y. June 26, 2012) ("[T]his case amply demonstrates that, in certain circumstances, an alleged infringer can know of an 'objectively high likelihood' of infringement even though she does not know that the relevant patent has issued.  Here, [plaintiff] has produced evidence that [plaintiff's agent] specifically told [infringing

---

[59] R. Doc. 342 at pp. 6-10 ("The Court finds that the scope of the claims of the '242 patent is substantially identical to the scope of the claims of the patent application.").  The Court recognizes that MGA challenges Innovention's reliance on the Court's finding that the claims of the '242 patent were substantially identical to those set forth in the '863 patent application.  According to MGA, the Court's decision concerned the issue of whether Innovention was entitled to provisional rights damages, and thus is not determinative with respect to whether the '863 application put MGA on notice of the '242 patent for the purposes of determining willful infringement.  *See* R. Doc. 617 at p. 11 n.2.  MGA's argument is not persuasive.  The Court agrees with Innovention that the Court's conclusion as a matter of law that the claims of the published '863 application – which Innovention in fact sent to MGA – are substantially identical to the claims in the '242 patent necessarily means that MGA had notice of the '242 patent claims at the time the patent issued.

defendant's] employees that he had applied for a patent under the [Patent Cooperation Treaty].  [Plaintiff] has further shown that the [infringed] patent is virtually identical to an English translation of the [Patent Cooperation Treaty] application that [plaintiff's agent] submitted.").

### B.    The First, Objective *Seagate* Prong

Having found that MGA had notice of the claims covered by the '242 patent on the date the '242 patent issued, the Court turns to the first, objective *Seagate* prong.  A patentee must establish willful infringement by clear and convincing evidence.  *Seagate*, 497 F.3d at 1368.  As a result, Innovention has the burden to prove, by clear and convincing evidence, that it has satisfied the first, objective *Seagate* prong.

*Seagate*'s objective prong "requires a retrospective assessment of the merits of the entire litigation determined 'based on the record ultimately made in the infringement proceedings.' "  *Highmark, Inc. v. Allcare Health Mgmt. Sys., Inc.*, 687 F.3d 1300, 1310 (Fed. Cir. 2012) (quoting *Bard*, 682 F.3d at 1008).  "The question is whether, in light of that record, no reasonable litigant could realistically expect success on the merits."  *Highmark*, 687 F.3d at 1310 (internal quotation marks and citation omitted).  Thus, according to the Federal Circuit, the "objective prong is a single backwards-looking inquiry into the reasonableness of the claims in light of the full record."  *Highmark*, 687 F.3d at 1310-11 (discussing the objective reasonableness standard in the context of the analogous issue of litigation misconduct for the purposes of 35 U.S.C. § 285).

During this litigation, MGA relied on an invalidity[60] defense – obviousness – and a

---

[60] Earlier in the litigation MGA also asserted an anticipation defense to argue the '242 patent was invalid.  This Court rejected that defense on summary judgment, *see Innovention*, 665 F.Supp.2d at 651, and MGA did not seek appellate review on that issue.  At this time, MGA does not assert that its

non-infringement defense.  According to MGA, Innovention cannot prove the first, objective *Seagate* prong by clear and convincing evidence because Innovention cannot show that MGA acted despite an objectively high likelihood that its actions constituted infringement of a valid patent.  In other words, MGA contends Innovention cannot prove that MGA's defenses were not objectively reasonable.  According to MGA, as *Seagate* requires Innovention to satisfy a two-pronged test to prevail on a claim for willful infringement, and as Innovention has allegedly failed to satisfy the first, objective *Seagate* prong, the Court should find that MGA's infringement was not willful.  Innovention opposes MGA's motion, arguing that MGA's defenses have been "flimsy" throughout the entire litigation and that a reasonable litigant asserting MGA's defenses could not have been expected to succeed on such defenses.  In addition, Innovention cross-moves the Court to affirm the jury's finding that MGA's infringement was objectively willful.  The Court addresses the objective reasonableness of each of MGA's defenses in turn.

### (1)   MGA's Invalidity Defense: The Obviousness Defense

First, the Court examines the objective reasonableness of MGA's defense that the '242 patent was invalid because the claimed invention was obvious.  "A patent is obvious, and, therefore, invalid 'if the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains.' " *Kinetic Concepts, Inc. v. Smith & Nephew, Inc.*, 688 F.3d 1342, 1360 (Fed. Cir. 2012) (quoting 35 U.S.C. § 103(a)).  "Obviousness is a question of law based

---

anticipation defense was objectively reasonable.

on underlying factual findings: (1) the scope and content of the prior art; (2) the differences between the claims and the prior art; (3) the level of ordinary skill in the art; and (4) objective indicia of nonobviousness." *Kinetic Concepts*, 688 F.3d at 1360 (citing *Graham v. John Deere Co.*, 383 U.S. 1, 17-18, 86 S.Ct. 684 (1966)).  These four factual findings are referred to as the "*Graham* factors."  *Kinetic Concepts*, 688 F.3d at 1360.

In this case, the Federal Circuit resolved the first *Graham* factor and remanded the remaining second through fourth *Graham* factors for resolution in this Court.  MGA contends its obviousness defense was objectively reasonable because the remaining *Graham* factors demonstrate that the '242 patent is obvious.  Specifically, MGA argues that it (1) consistently relied on the same three prior art references, which is relevant to the second *Graham* factor; (2) put forth evidence that the level of ordinary skill in the relevant art was high, which is relevant to the third *Graham* factor; (3) demonstrated that Innovention did not come forward with sufficient evidence of secondary considerations of nonobviousness regarding recognition, acclaim, and sales, which is relevant to the fourth *Graham* factor; and (4) demonstrated that Innovention did not come forward with sufficient evidence of secondary considerations of nonobviousness regarding copying, which is also relevant to the fourth *Graham* factor.[61]

### (a)    Second *Graham* Factor

The three prior art references MGA contends it has consistently relied[62] upon are the

---

[61] R. Doc. 598-1 at pp. 27-33.

[62] The Court observes that MGA began "consistently rel[ying]" on the Laser Chess articles as prior analogous art only after Innovention alleged that MGA's Laser Battle infringed the '242 patent, even though Shapiro was "aware of" the Laser Chess articles "in the first half of 2005."  R. Doc. 586 at p. 83 (Shapiro).  Indeed, when the patent application covering Laser Battle was filed with the PTO on July 12, 2007 (Application No. 11/776,701), Shapiro, his co-inventor Daniel Garcia and their counsel failed to disclose the Laser Chess articles as prior analogous art, despite having an obligation to do so under 27

Swift patent[63] and the Laser Chess articles.[64]  MGA argues that the combination of the Swift

patent and the Laser Chess[65] articles discloses every element of the asserted claims of the

'242 patent, and thus this supports MGA's argument that its obviousness defense was

reasonable because there are no differences between the prior art and the asserted claims

_____

C.F.R. § 1.56.  R. Doc. 605-2; Tr. Exhs. 247 and 248.

[63] *See supra* n.29.  The Swift patent was cited as a reference in the '242 patent.  *See* Tr. Exh. 1 at INNOV000238.

[64] As summarized by the Federal Circuit,

> The Laser Chess game is described in an article entitled "Laser Chess™ First Prize $5,000.00 Winner Atari ST Programming Contest," published in the April 1987 edition of *Compute!*. . . . Advanced Laser Chess is described in an article published in the Summer 1989 edition of *Compute!'s Amiga Resource*. . . .  Both articles disclose chess-like computer games with virtual lasers and mirrored and non-mirrored pieces, which are moved or rotated by players during alternating turns on a virtual, chess-like playing board.

*Innovention Toys*, 637 F.3d at 1317-18.  *Laser Chess* and *Advanced Laser Chess* were developed by Mike Duppong.  R. Doc. 589 at p. 82 (Phillips).  Certain witnesses sometimes refer to the Laser Chess articles as the "Duppong articles" in the record.  *See, e.g.*, R. Doc. 589 at p. 85 (Phillips).

[65] The Federal Circuit confirmed that the Laser Chess articles are in fact prior analogous art to be considered in determining whether the '242 patent is obvious.  *See Innovention*, 637 F.3d at 1322-23.  Nevertheless, as this Court has previously stated, "the Federal Circuit remanded the entirety of the second *Graham* factor without qualification" and thus did not resolve whether there were differences between the prior art and the claims set forth in the '242 patent.  *See* R. Doc. 522 at p. 4.

MGA continues to quote extensively from the Federal Circuit's opinion in order to argue that the Federal Circuit made certain factual findings regarding whether any differences exist between the claims of the '242 patent and the prior art.  *See* R. Doc. 598-1 at p. 9 (quoting *Innovention*, 637 F.3d at 1322-23).  This Court has already rejected this argument.  As the Court ruled prior to trial,

> the Court does not agree with Defendants' suggestion that the jury should be informed of, or instructed on, the Federal Circuit's observations set forth in footnote 9, *supra*.  The Federal Circuit made the observations set forth in footnote 9 in its analysis of why the Laser Chess articles constitute analogous prior art. The Federal Circuit did not instruct this Court, in making those observations, that it was resolving several of the differences between the prior art and the claimed invention such that these statements would be binding on this Court. Rather, the Federal Circuit held that Judge Feldman failed to properly consider "the differences between [the prior] art and the claimed invention" with respect to the second *Graham* factor and remanded "these factual determinations to the district court to consider *in the first instance*." *See Innovention Toys*, 637 F.3d at 1323 (emphasis added).

R. Doc. 552 at p. 4.

of the '242 patent.  *See Transocean Offshore Deepwater Drilling, Inc. v. Maersk Drilling USA, Inc.*, 699 F.3d 1340, 1347-48 (Fed. Cir. 2012) (stating that in order to establish a *prima facie* case of obviousness, the party challenging a patent's validity must show that every element of the asserted claims was taught in the combination of the prior art).  At trial, MGA's expert witness regarding obviousness – Samuel Phillips ("Phillips") – initially opined that the combination of the Laser Chess articles and the Swift patent disclosed every element of the asserted claims of the '242 patent.[66]  However, on cross-examination, counsel for Innovention asked Phillips whether he applied the Court's claim constructions[67] when forming his opinion that every element was disclosed.  Phillips responded that "[t]here are two definitions that two sets of judges have issued in this case."[68]  At that time, Phillips was escorted from the courtroom so that defense counsel could instruct him to apply the Court's claim constructions, including the Court's construction that a "game piece" had to be "a mirrored or non-mirrored structure that can be placed on the game board and moved by the players during the course of game playing."[69]  When Phillips returned to the witness stand and applied the correct claim construction of "game piece," Phillips admitted that the Laser Chess articles did not disclose game pieces.[70]  Prior to this

---

[66] R. Doc. 589 at pp. 65 and 75 (Phillips).

[67] R. Doc. 110 (order on claim construction).

[68] R. Doc. 589 at p. 138 (Phillips).  Phillips was referring to this Court's claim constructions and the Federal Circuit's opinion in *Innovention*, 637 F.3d 1314.  The Federal Circuit did not alter this Court's claim constructions, but rather affirmed them, thereby making such claim constructions the law of the case.  *See Innovention*, 637 F.3d at 1320.  Phillips' statement was incorrect.

[69] R. Doc. 110 at p. 1 (order on claim construction); R. Doc. 552 (*see also supra* n.65); R. Doc. 589 at pp. 138-141 (colloquy between the Court and counsel).  The Court gave a curative instruction to the jury when Phillips returned to the witness stand.  R. Doc. 589 at p. 141.

[70] R. Doc. 589 at p. 149 (Phillips).

admission, Phillips had testified on direct examination that he relied on the Laser Chess articles to show the prior art disclosed game pieces, because the Swift patent did not disclose them.[71]   Consequently, Phillips' new testimony undercut MGA's obviousness defense because he conceded that neither the Laser Chess articles nor the Swift patent disclosed game pieces.[72]  As neither the Laser Chess articles nor the Swift patent disclose game pieces, the prior art cannot be combined to establish a *prima facie* showing of obviousness.   *Transocean*, 699 F.3d at 1347-48.   Indeed, the jury confirmed that the combination of the prior art did not disclose every element of the claims asserted in the '242 patent.[73]  Consequently, the second *Graham* factor indicated that the '242 patent was not obvious.

### (b)    Third *Graham* Factor

Next, with respect to its obviousness defense, MGA argues it came forward with evidence indicating the level of ordinary skill in the relevant art was high.  According to the Federal Circuit, "it is generally easier to establish obviousness under a higher level of ordinary skill in the art." *Kinetic Concepts*, 688 F.3d at 1366; *Innovention*, 637 F.3d at 1323 ("A less sophisticated level of skill generally favors a determination of nonobviousness, and thus the patentee, while a higher level of skill favors the reverse." (citing *Union Carbide*

---

[71] R. Doc. 589 at pp. 90-91, 97 (Phillips).   Using the numbering system Phillips employed in his demonstrative claim charts shown to the jury at trial (*see* R. Docs. 624-1 and 624-2), Phillips testified on direct examination that the limitations met solely in the Laser Chess articles were 4, 11, 12, 18, 20, 21, 22, 28, 32 and 39.  R. Doc. 589 at pp. 83-117 (Phillips).

[72] Innovention's expert witness David Eimerl later testified that game pieces and other asserted claim elements were missing from both the Laser Chess articles and the Swift patent.  *See* R. Doc. 590 at pp. 102-116 (Eimerl).  The jury agreed.  *See* R. Doc. 574-3 at p. 3 (jury verdict form).

[73] R. Doc. 573-4 at p. 3 (jury verdict form finding that there are differences between the combination of the prior art and the asserted claims of the '242 patent).

*Corp. v. Am. Can Co.*, 724 F.2d 1567, 1573 (Fed. Cir. 1984)).  Following the Federal Circuit's remand of this matter,[74] MGA has argued that a person having ordinary skill in the art of the '242 patent would be a person with a mechanical engineering degree (or equivalent work experience) as well as "three years of experience designing optical systems involving lasers, laser detectors, mirrors, and precision alignment."[75]  Innovention, however, has asserted that the level of ordinary skill was much lower, requiring only a bachelor's degree in mechanical engineering (or equivalent work experience).[76]  The jury agreed with Innovention, finding that a "hypothetical person of ordinary skill in the art relevant to the '242 patent would have a Bachelor's Degree in Mechanical Engineering or equivalent experience."[77]

MGA asserts that although the jury found no additional experience with lasers and optics was necessary, "the facts . . . overwhelmingly demonstrate the contrary, that without [significant lasers and optics] knowledge one could not make the invention work."[78]  The Court disagrees with MGA, given that Innovention came forward with more persuasive expert testimony regarding the level of ordinary skill, which the jury rightly credited over

---

[74] The Court notes that from the outset of this litigation until the interlocutory appeal, MGA never came forward with *any* evidence regarding the level of ordinary skill in the relevant art.  *See Innovention*, 665 F.Supp.2d at 654 ("The plaintiff points out that the defendants have not provided any evidence that a layperson would have known of the Laser Chess references or other references cited or that a layperson would have any reason to modify the Laser Chess teachings; the defendants have thus failed to state a prima facie case of obviousness.  The Court agrees.  There is no record evidence suggesting what capabilities one with the level of ordinary skill in the art would have perceived as to obviousness.").

[75] R. Doc. 434-1 at p. 14 (motion for summary judgment of obviousness); *see also* R. Doc. 589 at pp. 73-75 (Phillips).

[76] R. Doc. 590 at pp. 80-90 (Eimerl).

[77] R. Doc. 574-3 at p. 2 (jury verdict form).

[78] R. Doc. 598-1 at p. 28.

MGA's expert testimony.

The Federal Circuit has set forth several factors that should be considered when determining the level of ordinary skill in the art, including (1) the educational level of active workers in the field (like the inventors and others), (2) the types of problems encountered in the art, (3) the prior art solutions to those problems, (4) the rapidity with which innovations are made, and (5) the sophistication of the technology. *Ruiz v. A.B. Chance Co.*, 234 F.3d 654, 666-67 (Fed. Cir. 2000). On direct examination, counsel for MGA asked Phillips whether he considered the *Ruiz* factors[79] in reaching his opinion. While Phillips testified at that time – without explanation or references to evidence regarding the *Ruiz* factors – that he had considered them,[80] on cross-examination Phillips clarified that he actually had determined the level of ordinary skill in the art without considering the *Ruiz*

---

[79] Regarding the factors he considered, Phillips testified as follows:

| Counsel: | [U]nder that heading Ordinary Skill in the Art, do you list the factors that you considered in coming up with your opinion? |
|---|---|
| Phillips: | Yes. Would you like me to state them? |
| Counsel: | Yes. |
| Phillips: | They include the types of problems that a person might encounter. The prior art solutions to these problems. The [rapidity], the speed with which innovations are made. How sophisticated the technology is. And the educational level of active workers in the field, and you can include the inventors of the 242 [patent]. |
| Counsel: | And did you consider each and every one of those factors in coming up with your definition of the person of ordinary skill? |
| Phillips: | Yes, I did. |

R. Doc. 589 at p. 75 (Phillips). While these factors are not identified as the *Ruiz* factors in Phillips' testimony, Phillips in fact recited all of the factors set forth in *Ruiz*. *See Ruiz*, 234 F.3d at 666-67.

[80] *See supra* n.80.

factors because this inquiry did not require "a lot of heavy-duty thinking."[81]

By contrast, Innovention's expert witness David Eimerl ("Eimerl") testified in great detail about the evidence he considered *vis-à-vis* the *Ruiz* factors in reaching his conclusion that the level of ordinary skill in the relevant art did not require an additional three years of experience designing optical systems involving lasers after obtaining a bachelor's degree in mechanical engineering.[82]  While MGA contends that Eimerl "admi[tted] that the skilled artisan must have 'significant levels of skill in lasers and optics' to practice the '242 patent,"[83] thereby supporting the objective reasonableness of MGA's defense, Eimerl confirmed on cross-examination that he did not agree with that argument from MGA's counsel.[84]  Rather, Eimerl reiterated, the "patent must contain enough information . . . to enable a person of ordinary skill to practice the invention."[85]  Given that a "person with a BS in mechanical engineering does have *some knowledge* of optics and lasers," Eimerl continued, "someone with a BS in mechanical engineering" would be able to practice the invention claimed in the '242 patent without the need for *an additional* three years of experience working with lasers and optics.[86]  The jury, after weighing the evidence, rightly concluded that the level of ordinary skill in the relevant art was not nearly as high as MGA

---

[81] R. Doc. 589 at pp. 152-53 (Phillips).

[82] R. Doc. 590 at pp. 80-90 (Eimerl).

[83] R. Doc. 617 at p. 17 (quoting R. Doc. 591 at pp. 44-46 (Eimerl)).

[84] R. Doc. 591 at pp. 47-49 (Eimerl).

[85] R. Doc. 591 at p. 47 (Eimerl).

[86] R. Doc. 591 at p. 47 (Eimerl) (emphasis added).

asserted.   Consequently, the third *Graham* factor indicated that the '242 patent was not obvious.

(c)   **Fourth *Graham* Factor: Recognition, Acclaim, and Sales**

Furthermore, with respect to its obviousness defense, MGA contends it demonstrated at trial that Innovention did not come forward with sufficient evidence of secondary considerations[87] of nonobviousness regarding recognition, acclaim, and sales, because there was no indication that the game's success was connected to any specific feature claimed in the '242 patent. Thus, MGA argues, Innovention failed to "show that any commercial success and industry praise is a direct result of the claimed invention, and not an unclaimed feature of the device, or some feature known in the prior art."[88]  Innovention responds that it satisfied its own initial burden to show a nexus[89] between the claimed invention and the commercial success of the game by demonstrating that the '242 patent's

---

[87] "Secondary considerations" of nonobviousness includes, but is not limited to, evidence such as commercial success, long felt need, or skepticism of experts.  The Federal Circuit " 'has repeatedly explained, [that secondary consideration evidence] is not just a cumulative or confirmatory part of the obviousness calculus but constitutes independent evidence of nonobviousness.' " *Pressure Prods. Med. Supplies, Inc. v. Greatbatch Ltd.*, 599 F.3d 1308, 1319 (Fed. Cir. 2010) (quoting *Ortho-McNeil Pharm., Inc. v. Mylan Labs.*, Inc., 520 F.3d 1358, 1365 (Fed. Cir. 2008)) (brackets in original).

[88] R. Doc. 598-1 at p. 29 (citing *ArcelorMittal France v. AK Steel Corp.*, 700 F.3d 1314, 1326 (Fed. Cir. 2012); *Media Techs. Licensing, LLC v. Upper Deck Co.*, 596 F.3d 1334, 1339 (Fed. Cir. 2010)) (emphasis omitted).

[89] In order for secondary considerations "to be accorded substantial weight, its proponent [i.e., the patentee] must establish a nexus between the evidence and the merits of the claimed invention." *In re GPAC Inc.*, 57 F.3d 1573, 1580 (Fed. Cir. 1995) (citation omitted).  "A prima facie case of nexus is made when the patentee shows both that there is commercial success, and that the product that is commercially successful is the invention disclosed and claimed in the patent." *Crocs, Inc. v. Int'l Trade Comm'n*, 598 F.3d 1295, 1311 (Fed. Cir. 2010)  (citing *In re GPAC Inc.*, 57 F.3d at 1580).  "Once the patentee demonstrates a prima facie nexus, the burden of coming forward with evidence in rebuttal shifts to the challenger."  *Crocs*, 598 F.3d at 1311 (citing *Demaco Corp. v. F. Von Langsdorff Licensing Ltd.*, 851 F.2d 1387 (Fed. Cir. 1988)).

claims are coextensive with the embodying product.[90]  As a result, Innovention contends,

it succeeded in shifting the burden to MGA to show that the game's success or praise was

due to something other than the claimed invention.

At trial, Innovention offered substantial evidence of secondary considerations of

nonobviousness, including (1) impressive sales figures of the game despite the fact that

Innovention is a very small company with almost no advertising budget, (2) frequent

industry articles highly praising the game, and (3) the awards the game has won or the

awards for which the game has been nominated.[91]  Innovention also introduced evidence

at trial that the game embodies the claimed invention taught in the '242 patent.[92]  In

addition, the parties agree that the game is *not* a discrete, patented component of a larger

system, such as a patented automatic-locking feature contained in a utility lighter with an

extended rod (e.g., the type of lighter "useful for lighting barbecue grills").  *See Tokai Corp.*

*v. Easton Enters., Inc.*, 632 F.3d 1358, 1370 (Fed. Cir. 2011) ("[Plaintiff]'s corporate

representative not once referred to the automatic locking feature of [plaintiff]'s lighters –

*i.e.*, the feature that purportedly distinguishes the claimed inventions from prior art utility

lighters.  The district court thus held that because [plaintiff] failed to establish a nexus

between the automatic safety feature and the alleged commercial success, [Plaintiff]'s sales

data were not pertinent to the court's obviousness determination.  We agree with the

district court with respect to the final *Graham* factor.  [Plaintiff] proffered no evidence from

---

[90] R. Doc. 605 at p. 30 (citing *Crocs, Inc. v. Int'l Trade Comm'n*, 598 F.3d 1295, 1310-11 (Fed. Cir. 2010); *J.T. Eaton & Co., Inc. v. Atl. Paste & Glue, Co.*, 106 F.3d 1563, 1571 (Fed. Cir. 1997)).

[91] *See, e.g.*, R. Doc. 583 at pp. 65, 85-88, 99-102 (Larson); R. Doc. 587 at pp. 100-106 (Hooper); R. Doc. 585 at pp. 40-135 (Boyles); Tr. Exhs. 5, 7, 8, 160, 161, 198, 199, 215, 216, 217, 227, 372, and 373.

[92] R. Doc. 583 at pp.39-40 (Larson).

which one could reasonably infer a nexus between its sales data and its utility lighters' automatic-locking features."). Accordingly, because Innovention showed that the commercially successful product is the invention disclosed and claimed in the '242 patent, Innovention could rely on the presumption that the requisite nexus exists. *See Crocs, Inc. v. Int'l Trade Comm'n*, 598 F.3d 1295, 1310-11 (Fed. Cir. 2010); *J.T. Eaton & Co., Inc. v. Atl. Paste & Glue, Co.*, 106 F.3d 1563, 1571 (Fed. Cir. 1997); *Demaco Corp. v. F. Von Langsdorff Licensing, Ltd.*, 851 F.2d 1387, 1392 (Fed. Cir. 1988). Thus, Innovention shifted the burden to MGA to show that the game's success or praise was due to some feature other than the claims covered in the '242 patent. *Crocs*, 598 F.3d at 1310-11; *Brown & Williamson Tobacco Corp. v. Philip Morris, Inc.*, 229 F.3d 1120, 1130 (Fed. Cir. 2000). Even though the burden shifted to MGA to come forward with rebuttal evidence, MGA failed to do so. Thus, MGA did not show that something *other than* the invention claimed in the '242 patent was responsible for the game's commercial success and praise.

Ultimately, the jury confirmed that Innovention had established, with respect to objective factors of nonobviousness, (1) "[c]ommercial success of a product embodying the patented invention [was] due to the merits of the claimed invention, rather than due to advertising, promotion, or salesmanship," (2) "[a]cceptance by others of the claimed invention as shown by praise from others in the field or from the licensing of the claimed invention," and (3) "[s]urprise, initial skepticism, or disbelief regarding the claimed invention."[93] Given that the jury found Innovention established a nexus between the

---

[93] R. Doc. 574-3 at p. 7 (jury verdict form). The jury also found that Innovention had established, with respect to objective factors of nonobviousness, (4) "[a] long felt need for the solution that is provided by the claimed invention," (5) "[u]nexpected and superior results from the claimed invention over the closest prior art," and (6) "copying of the claimed invention by others." *See id.* The Court discusses the significance of copying *infra*.

patented invention and the secondary considerations of commercial success and industry praise, which MGA failed to rebut,[94] Innovention's evidence of secondary considerations indicates that the '242 patent was not rendered invalid due to obviousness. *Crocs*, 598 F.3d at 1311.

---

[94] MGA also argues that "[e]ven if there were sufficient evidence of secondary considerations, however, that would not necessarily defeat the obviousness defense, much less render it unreasonable." *See* R. Doc. 598-1 at p. 30 (citing *Asyst Techs., Inc. v. Emtrak, Inc.*, 544 F.3d 1310, 1316 (Fed. Cir. 2008); *Pfizer, Inc. v. Apotex, Inc.*, 480 F.3d 1348, 1372 (Fed. Cir. 2007); *Richardson-Vicks, Inc. v. UpJohn Co.*, 122 F.3d 1476, 1483 (Fed. Cir. 1997)). The Court observes that prior to Defendants' appeal to the Federal Circuit, MGA never addressed Innovention's secondary considerations evidence when arguing to this Court that the '242 patent is invalid. *See* R. Doc. 126 (Defendants' pre-appeal motion for summary judgment regarding the '242 patent's invalidity) and R. Docs. 161 and 169 (Defendants' memoranda in opposition to Innovention's pre-appeal motions for summary judgment regarding the '242 patent's validity).

While a court *may* determine that a patent is invalid when the first three *Graham* factors strongly indicate a patent is obvious and the patentee's evidence of secondary considerations is very weak, *see KSR*, 550 U.S. at 426 (affirming summary judgment where patentee "had shown no secondary factors to dislodge the determination that [the relevant claim] is obvious"), a court must nevertheless still examine a patentee's evidence of secondary considerations of nonobviousness when a patentee submits such evidence. *See Mintz v. Dietz & Watson, Inc.*, 679 F.3d 1372, 1378-79 (Fed. Cir. 2012) (stating that the Federal Circuit "requires consideration of these objective indicia because they provide objective evidence of how the patented device is viewed in the marketplace, by those directly interested in the product." (internal quotations marks and citation omitted)). Indeed, according to the Federal Circuit, secondary considerations "can be the most probative evidence of non-obviousness in the record." *Crocs*, 598 F.3d at 1310; *Mintz*, 679 F.3d at 1378-79 ("These objective criteria thus help turn back the clock and place the claims in the context that led to their invention. Technical advance, like much of human endeavor, often occurs through incremental steps toward greater goals. These marginal advances in retrospect may seem deceptively simple, particularly when retracing the path already blazed by the inventor.). The fact that MGA refused to acknowledge Innovention's secondary considerations evidence prior to appeal indicates that this aspect of MGA's obviousness defense is MGA's attempt at Monday-morning quarterbacking.

Likewise, following remand, Phillips' testimony that MGA instructed him to ignore Innovention's secondary considerations evidence when forming his expert opinion expressly contradicts caselaw requiring courts to examine secondary considerations evidence. *See* R. Doc. 589 at p. 171 (Phillips); R. Doc. 603-3 at pp. 66-69. MGA speciously argues that Phillips' failure to weigh Innovention's secondary considerations evidence is of no moment because "[e]ven if the report did include such an analysis, Mr. Phillips would not have been able to present it at trial" due to one of this Court's pre-trial rulings. R. Doc. 617 at p. 17. The Court again reminds MGA that Phillips was prevented from testifying at trial about secondary considerations evidence *precisely because* he improperly disregarded precedent requiring an examination of the fourth *Graham* factor. *See* R. Doc. 468 at p. 11 ("*Graham* and the Federal Circuit's instructions to this Court in *Innovention Toys* require the jury to consider the fourth *Graham* factor before resolving the ultimate question of whether the '242 patent is obvious or nonobvious. *See Graham*, 383 U.S. at 17-18; *Innovention Toys*, 637 F.3d at 1323. . . . Phillips testified [at his deposition] that he did not consider the required fourth *Graham* factor in any way in forming his opinion and Defendants' counsel conceded at oral argument that he is not qualified to do so. *As a result*, Phillips may not testify regarding secondary considerations evidence.") (footnote omitted, emphasis added).

**(d)   Fourth *Graham* Factor: Copying**

Finally, with respect to its obviousness defense, MGA argues Innovention did not come forward with sufficient evidence of secondary considerations of nonobviousness regarding copying.  In sum, MGA submits that "substantial evidence introduced at trial confirms that MGA did not copy" Innovention's game.[95]  Thus, MGA contends, its defense that Innovention had no secondary considerations evidence of copying was objectively reasonable.

"Copying 'requires evidence of efforts to replicate a specific product.' " *Tokai*, 632 F.3d at 1370 (citing *Wyers v. Master Lock Co.*, 616 F.3d 1231, 1246 (Fed. Cir. 2010)).  At trial, MGA argued that Shapiro independently invented Laser Battle at the end of 2004.[96]  However, MGA presented only Shapiro's testimony[97] to support its argument that Shapiro did not copy Innovention's game; likewise, Shapiro was MGA's only witness who could authenticate and discuss the relevant exhibits implicated by Shapiro's testimony.[98]  MGA did not call Fan, the MGA employee in Hong Kong to whom Shapiro sent a copy of Innovention's game in December 2005.  MGA also did not call David Garcia, the co-inventor with whom Shapiro allegedly collaborated to create Laser Battle.  MGA did not produce, much less introduce into evidence, any e-mail correspondence between Shapiro and Fan after Fan inquired which part of the Innovention's game was patented.  Similarly,

---

[95] R. Doc. 598-1 at p. 31.

[96] Shapiro's "Durka-Durka" sketch was drawn on the back of a Bratz doll comment card pertaining to comments MGA received from December 8-16, 2004.  Tr. Exh. 271.  Nothing on the comment card indicates the date the card was printed or the date when Shapiro drew the sketch.

[97] As discussed *supra* at n.18, Shapiro testified via video deposition.

[98] *See* R. Doc. 586 (Shapiro); Tr. Exhs. 36, 37, 38, 39, 63, 110, 112, 114, 116, 118, 120, 271, 272, 273, 274, 276, 278, 280, 282, 284, 286, 288, 289; DXP-6.

MGA did not introduce any contemporaneous evidence of Shapiro's claim of independent invention — such as e-mails, drawings, etc. — that were dated before the end of August 2005.[99]

By contrast, Innovention delineated the similarities between Innovention's game and MGA's Laser Battle,[100] and drew the jury's attention to substantial evidence supporting its allegation that MGA copied a specific product — Innovention's game. *Tokai*, 632 F.3d at 1370. First, Innovention introduced evidence documenting that its game was exhibited at the February 2005 International Toy Fair to great "buzz."[101] Innovention also introduced a copy of Shapiro's resume stating, in pertinent part, "Exhibitions: . . . NY Toy Fair, 2002, 2003, 2005, MGA showroom: a variety of products including remote controlled vehicles, Brats Vehicles, Brats consumer electronics, and others."[102] Furthermore, Innovention elicited testimony from Shapiro that MGA required him to search the Internet during product development for information regarding competitive products[103] and that in early 2005 he found a game on the Internet with "a board that had mirrors and lasers on top of it" where the laser's path was illuminated using "smoke or something."[104] Innovention's

---

[99] The first e-mail reference MGA's "Laser Strategy Game" is dated August 30, 2005. *See* Tr. Exh. 288 at p. 7.

[100] R. Doc. 583 at pp. 91-92 (Larson); R. Doc. 587 at pp. 78-86 (Hooper); Tr. Exhs. 246, 289, 380, 387; PPE-1, PPE-4, PPE-11

[101] R. Doc. 583 at pp. 57-58 (Larson); R. Doc. 587 at pp. 71-73 (Hooper); Tr. Exh. 179.

[102] Tr. Exh. 136. MGA argues that "Shapiro's resume states only that certain of his creations were exhibited at the Fair, not that he was there. There is no evidence in the record that Mr. Shapiro attended that Fair." R. Doc. 617 at p. 7. The Court observes that there is no evidence in the record of Shapiro denying that he attended the 2005 International Toy Fair.

[103] R. Doc. 586 at p. 16 (Shapiro); R. Doc. 588 at pp. 78-79 (Phillips)

[104] R. Doc. 586 at pp. 18-19 (Shapiro).

website promoting its game – which included photographs of lasers passing through smoke – had launched prior to the February 2005 International Toy Fair.[105]  In addition, Shapiro admitted that he found the Laser Chess articles on the Internet in the first half of 2005 and played the game.[106]  Shapiro further confirmed that he had purchased two copies of Innovention's game on December 1, 2005, and played the game[107] and then sent one copy of Innovention's game to Fan.[108]  However, Shapiro testified he could not recall whether he responded to Fan's e-mail inquiring which part of Innovention's game was covered by the "patent pending"[109] language on the box.[110]  Finally, Innovention introduced evidence

---

[105] R. Doc. 587 at pp. 69-71 (Hooper).

[106] R. Doc. 586 at pp. 82-83 (Shapiro).

[107] R. Doc. 583 at pp. 67-68 (Larson); Tr. Exh. 137.  At trial, the jury heard the following colloquy:

| | |
|---|---|
| Counsel: | [D]id you buy two [of Innovention's] games? |
| Shapiro: | Apparently so. |
| | . . . |
| Counsel: | What made you decide to purchase these games? |
| Shapiro: | As with any other competitive items, whenever we find anything interesting, relating or not relating to what we're working on, we'll purchase it. This is policy. |
| | . . . |
| Counsel: | Okay.  What did you do with them? |
| Shapiro: | I played with it when it finally arrived. |

R. Doc. 586 at pp. 84-85 (Shapiro).

[108] R. Doc. 586 at pp. 85-86 (Shapiro) (authenticating e-mail from Fan).

[109] PPE-11.

[110] Tr. Exh. 246.  At trial, the jury heard the following colloquy:

| | |
|---|---|
| Counsel: | [Showing Trial Exhibit 246 to Shapiro].  Can you tell us what this is? |

indicating that Shapiro failed to disclose the Laser Chess articles and Innovention's game to the PTO in connection with his patent application, despite having a duty to do so.[111]  In sum, the overwhelming evidence indicated that MGA copied Innovention's game, and the jury accordingly resolved all issues of credibility against Shapiro's self-serving, uncorroborated denials and in favor of Innovention.[112]

**(e)     The Court Finds that MGA's Obviousness Defense Was Not Objectively Reasonable**

To find that Innovention satisfied *Seagate*'s first, objective prong by clear and convincing evidence, the Court must retrospectively assess the entire litigation and determine that "no reasonable litigant could realistically expect success on the merits." *Highmark*, 687 F.3d at 1310.  In other words, for Innovention to succeed, the Court must

---

| Shapiro: | This is an e-mail from Alex [Fan] telling us: "I received a laser game sample on this evening. I found it marked with 'patent pending' on the box. Do you know which part did they patent?" |
|---|---|
| Counsel: | And what's the date of this e-mail? |
| Shapiro: | This is December 8th[, 2005]. |
| Counsel: | Okay.  Is this referring to one of [Innovention's] games? |
| Shapiro: | I believe it is. I can't say for certain, but it seems like it is. |
| | . . . |
| Counsel: | What did you do when you received this e-mail? |
| Shapiro: | I probably replied.  I'm not sure what I did, but we have, obviously, moved forward with our game.  I don't know -- I don't remember exactly what I was doing. |

R. Doc. 586 at pp. 85-86 (Shapiro).

[111] R. Doc. 586 at pp. 82-83, 89-91 (Shapiro); Tr. Exh. 250.

[112] R. Doc. 574-3 at p. 7 (jury verdict form, question no. 4).

conduct "a single backwards-looking inquiry into the reasonableness" of MGA's obviousness defense in light of the full record, *Highmark*, 687 F.3d at 1310-11, and conclude as a matter of law that MGA's obviousness defense was not objectively reasonable.

As set forth above, the Court has reviewed the jury's underlying factual findings, which completely rejected MGA's obviousness defense, and found such findings were supported by substantial evidence. Having carefully considered the entire record, the evidence introduced at trial, and the jury's factual findings, the Court finds as a matter of law Innovention has proven, by clear and convincing evidence, that MGA's obviousness defense was not objectively reasonable.[113] Consequently, the Court finds as a matter of law that Innovention has satisfied the first, objective *Seagate* prong as to MGA's obviousness defense.

### (2)   MGA's Non-Infringement Defense

Second, the Court examines the objective reasonableness of MGA's non-infringement defense. "Determining whether a patent claim has been infringed involves two steps: (1) claim construction to determine the scope of the claims, followed by (2) determination whether the properly construed claim encompasses the accused structure." *Bai v. L & L Wings, Inc.*, 160 F.3d 1350, 1353 (Fed. Cir. 1998) (citations omitted). The first step, claim construction, is a question of law. *Cybor Corp. v. FAS Techs., Inc.*, 138 F.3d

---

[113] Likewise, MGA's reliance on the fact that the Court permitted MGA's obviousness to go to the jury – by denying MGA's motion for summary judgment of no willful infringement and denying Innovention's motion for judgment as a matter of law – as proof that its obviousness defense was objectively reasonable is unavailing. Allowing a defense to go to the jury does not expressly foreclose a finding of willfulness. *See K-TEC*, 696 F.3d at 1378 (affirming willful infringement even though obviousness defense went to the jury); *see also Tomita*, 2012 WL 2524770, at *9 ("The mere existence of a defense cannot preclude that possibility of an 'objectively high likelihood' of infringement. Indeed, those who knowingly infringe a patent presumably attempt to manufacture defenses, however contrived and unavailing they may prove.").

1448, 1455 (citation omitted).  The second step, determining infringement, whether literal or under the doctrine of equivalents, is a question of fact.  *Bai*, 160 F.3d at 1353.  Literal infringement may be properly decided upon summary judgment – as this Court previously did in rejecting MGA's infringement defense – when no genuine issue of material fact exists.  *Innovention Toys*, 637 F.3d at 1319.  That is, "when no reasonable jury could find that every limitation recited in the properly construed claim either is or is not found in the accused device."  *Innovention Toys*, 637 F.3d at 1319.

At the time MGA moved for summary judgment, MGA argued that Laser Battle did not infringe the '242 patent because the "Towers"[114] in Laser Battle are not a "movable key piece."  Following the *Markman* hearing, the Court construed the claim limitation "movable key piece" to mean "capable of movement as called for by the rules of the game or game strategy."[115]  According to MGA, its non-infringement defense was objectively reasonable because "the Laser Battle game rules make [it] clear that the 'Towers should always remain in their original position on the board' – that is, a player cannot move the Tower once the game starts."[116]  The Laser Battle Rules also include a section entitled "Advanced Game Play," which includes a "Note" stating that "Except for Advanced Game Play, the Target Tower and Laser Guns will remain in their standard positions in all formations."[117]  MGA contends that this Court and the Federal Circuit erred in construing the Note to mean that

---

[114] A "Tower" is a piece that is analogous to the king in chess.  R. Doc. 598-1 at p. 24.  Each Tower is a six-sided piece with a target area on only three of the Tower's sides.  The backside of each Tower does not have any target areas.  Tr. Exh. 289 at INNOV000267.

[115] *Innovention*, 665 F.Supp.2d at 644-45.

[116] R. Doc. 598-1 at p. 25 (citing Tr. Exh. 289 at INNOV000267).

[117] Tr. Exh. 289 at INNOV000268.

the Tower can move during the game in Advanced Game Play because, MGA argues, "if the rules allowed a player to rotate his Tower into different positions on the board during the game, that player could potentially 'game' the game, and position his Tower to expose only the [target-less] backside."[118] Such maneuvering would, in effect, prevent the opponent's laser beam from ever hitting the Tower's target area, according to MGA.[119] "That, then, would not be the Laser Battle game described in the rules," MGA contends.[120] Indeed, MGA submits, Eimerl advanced this same theory when he testified that Swift's mirrored pieces are not "movable" game pieces as called for by the '242 patent because they may not be moved under the rules of the game embodied in the Swift patent.[121]

MGA's reasoning regarding its non-infringement defense contains numerous logical flaws.  First, MGA does not address this Court's finding, affirmed on appeal, that Laser Battle has movable key pieces because the Towers may be placed in different spaces on the game board during game set-up.[122] Second, MGA has not provided any evidentiary support that moving the Towers during game play, as contemplated by the Advanced Game Play instructions, would lead to an absurd result.  Contrary to MGA's argument, as this Court found and the Federal Circuit affirmed, Advanced Game Play connotes additional complexity such that players can move and rotate the various pieces, including the Towers.  Given that three sides of a Tower have targets, and the Advanced Game Play instructions

---

[118] R. Doc. 598-1 at p. 25.

[119] R. Doc. 598-1 at p. 25.

[120] R. Doc. 598-1 at p. 25 (citing Tr. Exh. 289 at fig. 12).

[121] R. Doc. 598-1 at pp. 25-26.

[122] *Innovention*, 665 F.Supp.2d at 646-47 & 647 n.18; *Innovention*, 637 F.3d at 1320.

contemplate that the Laser Guns can move and rotate,[123] players may achieve a laser strike under the Advanced Game Play instructions.  Thus, MGA has not shown that a player could position its Tower in Advanced Game Play such that it could never be struck.  Third, Eimerl's testimony that MGA cites in support of its argument does not solely focus on whether Swift's game pieces are "movable" under the rules of the Swift game.[124]  Rather, Eimerl testified that Swift does not disclose a "game board" because the Swift game is played in the void between two pieces of Plexiglas, rather than on a physical structure that supports the game pieces.  Furthermore, Eimerl testified that there are no "game pieces" in Swift because game pieces must be "*placed on the game board*" – a physical structure – in addition to being capable of movement during the course of the game.[125]  MGA's non-infringement defense hinging on the fact that the Towers are not "movable" is completely unsuccessful.

Again, the Court's role is to conduct "backwards-looking inquiry into the reasonableness" of MGA's non-infringement defense in light of the full record," *Highmark*, 687 F.3d at 1310-11, and determine whether MGA's non-infringement defense was objectively reasonable.  Having carefully considered the entire record and the evidence introduced at trial, the Court finds as a matter of law that Innovention has proven, by clear

---

[123] Tr. Exh. 289 at p. INNOV000267.

[124] R. Doc. 598-1 at pp. 25-26 (citing R. Doc. 590 at pp. 106-107 (Eimerl)).

[125] R. Doc. 590 at pp. 106-107 (Eimerl).  In addition to recognizing that the Swift mirror assemblies cannot be moved once they are inserted into Swift's x-shaped slots, Eimerl further testified that there are other differences between Swift and the claims the '242 patent, including that (1) Swift has no starting configuration because Swift's mirror assemblies are not placed in Swift's chamber at the start of game play, R. Doc. 590 at p. 112 (Eimerl) and Tr. Exh. 128 at p. 9:47-53; and (2) Swift's scoring module is not a "movable key playing piece" because it is fixed in place such that it can never be placed or moved, R. Doc. 590 at pp. 96-97 (Eimerl), R. Exh. 128 at p. 7:11-17.  Unlike Swift, the '242 patent requires, and Laser Battle has, game pieces and key pieces that are positioned on the game board in a starting configuration and are capable of being moved according to the rules of the game.

and convincing evidence, that MGA's non-infringement defense was not objectively reasonable. Thus, the Court finds that Innovention has satisfied the first, objective *Seagate* prong as to MGA's non-infringement defense.

### C.   The Second, Subjective *Seagate Prong*

Because the Court has found as a matter of law that Innovention has satisfied the first, objective *Seagate* prong, the Court now turns to the second, subjective *Seagate* prong. *Seagate*'s second prong is a question of fact for the jury, *Bard*, 682 F.3d at 1008, which the jury answered in the affirmative by finding that MGA's infringement was subjectively willful.[126] The Court reviews the jury's subjective willfulness finding to determine whether it is supported by substantial evidence.   *Power Integrations, Inc. v. Fairchild Semiconductor, Int'l*, 711 F.3d 1348, 1357 (Fed. Cir. 2013); *Bard*, 682 F.3d at 1008.

To satisfy the second, subjective *Seagate* prong, Innovention must prove by clear and convincing evidence that the objectively-defined risk that MGA's actions constituted infringement of a valid patent was either known, or so obvious that it should have been known, to MGA. *Seagate*, 497 F.3d at 1371. "[I]n considering a party's subjective state of mind, [the Court must] 'to take into account the totality of circumstances.' " *Highmark*, 687 F.3d at 1311 (quoting *Mach. Corp. of Am. v. Gullfiber AB*, 774 F.2d 467, 473 (Fed. Cir. 1985)).  "Unlike the objective prong, which is a single retrospective look at the entire litigation, the subjective prong may suggest that a case initially brought in good faith may be continued in bad faith depending on developments during discovery and otherwise." *Highmark*, 687 F.3d at 1311.

---

[126] R. Doc. 574-3 at p. 12 (jury verdict form).

MGA has declined to address the second, subjective *Seagate* prong, arguing instead that consideration of the second prong is unnecessary because its defenses were objectively reasonable.  Innovention argues that the evidence summarized above showing that Shapiro not only copied Innovention's game, but further failed to disclose the game and the Laser Chess articles to the PTO when seeking a patent covering Laser Battle, is more than substantial evidence to support the jury's finding that the objectively-defined risk MGA's actions constituted infringement of a valid patent was either known, or so obvious that it should have been known, to MGA.  The Court agrees.  Innovention's evidence at trial demonstrated that MGA had knowledge of the '242 patent and yet MGA, "obviously, moved forward"[127] with Laser Battle despite having knowingly copied Innovention's game.  Thus, the Court concludes that substantial evidence supports the jury's verdict finding that MGA knew, or should have known, of the obvious, objectively-defined risk that its actions constituted infringement of a valid patent.  *Seagate*, 497 F.3d at 1371.  Innovention has satisfied the second, subjective *Seagate* prong by clear and convincing evidence.

The Court takes a moment to note – and provide context why – certain evidence regarding MGA's state of mind is missing from the record.  Though MGA was not required to obtain any opinion of counsel,[128] MGA obtained an opinion from Ira Siegel ("Siegel")

---

[127] R. Doc. 586 at p. 86 (Shapiro).

[128] Following *Seagate*, alleged infringers are no longer obligated to obtain an opinion of counsel when faced with a patent infringement charge.  *See Seagate*, 497 F.3d at 1371 ("Accordingly, we overrule the standard set out in *Underwater Devices* and hold that proof of willful infringement permitting enhanced damages requires at least a showing of objective recklessness.  Because we abandon the affirmative duty of due care, we also reemphasize that there is no affirmative obligation to obtain opinion of counsel.").

regarding invalidity and non-infringement *vis-à-vis* the '242 patent.[129]   Throughout the litigation, MGA maintained that what it characterized as Siegel's opinion – contained in two letters marked as trial exhibits 86 and 268 – was protected by the attorney-client privilege.[130]   However, at trial, MGA sought to introduce Siegel's letters through the testimony of MGA's in-house counsel, Sam Khare ("Khare").   MGA intended to use the letters to show that it did not have the requisite state of mind necessary for Innovention to prove that the infringement was subjectively willful.[131] Thus, the Court concluded that MGA speciously used Siegel's opinion as a sword and a shield.[132] Nevertheless, because excluding the exhibits would have unduly prejudiced MGA, the Court allowed the admission of trial exhibits 86 and 268 on Innovention being allowed to depose Khare.[133]   The Court also ordered MGA to "produce all documents responsive to" Innovention's document request

---

[129] *See, e.g.*, R. Doc. 423-1 at p. 17 ("Although it was not required to do so, MGA obtained an opinion of counsel regarding both invalidity and non-infringement, and provided the opinion of counsel letter to plaintiff before plaintiff served MGA.") (capitalization removed).

[130] R. Doc. 584 at pp. 17-18.   MGA produced Shapiro as MGA's corporate representative pursuant to Rule 30(b)(6) of the Federal Rules of Civil Procedure.   MGA refused to allow Innovention's counsel to question Shapiro about any opinions of counsel regarding non-infringement or invalidity.   R. Doc. 584 at p. 18.   Likewise, MGA refused to produce any documents responsive to Innovention's discovery requests directed toward opinions of counsel.   R. Doc. 584 at p. 18 ("Then the plaintiffs also propounded Document Request 33 that asked for the production of all documents that were communications. In its response MGA asserted an attorney-client privilege. The plaintiffs propounded Interrogatory No. 6 where they asked for all opinions, and that's opinions whether written or oral; and they also asked for the [identity of the] persons most knowledgeable about such information and all documents that constitute, refer, or relate to those, to such information. In their response the defendants again asserted an attorney-client privilege.").

[131] R. Doc. 584 at p. 19.

[132] R. Doc. 584 at pp. 17-19.

[133] After hearing argument from counsel, the Court ruled that these exhibits were admissible.   R. Doc. 584 at pp. 17-21.   Because MGA declined to call Khare, ultimately the exhibits were not admitted into evidence at trial.   Nevertheless, copies of Siegel's letters are contained in the record in the above-captioned matter as exhibits to MGA's motion for summary judgment of no willful infringement.   *See* R. Doc. 423-11 at pp. 2-3 (October 12, 2007 letter from Ira Siegel to Matthew Lowrie; referred to in the trial record as Tr. Exh. 268) and R. Doc. 423-11 at pp. 2-73 (October 19, 2007 letter from Ira Siegel to Robert J. Silverman; referred to in the trial record as Tr. Exh. 86).

number 33.[134]  After repeatedly representing to the Court that the documents Innovention had been seeking since at least 2008 did not exist,[135] MGA produced documents responsive to Innovention's discovery requests.[136]   As a result, the Court sanctioned MGA.[137] Thereafter, even though MGA had relied on Siegel's opinion as a defense and represented that it planned to present Siegel's opinion as evidence at trial via Khare's testimony, MGA put Khare on a plane back to Los Angeles, California, rather than call him to testify.  Khare's testimony may have indicated whether MGA had the requisite state of mind necessary to support Innovention's case regarding the second, subjective *Seagate* prong.  By abandoning its strategy at the last minute, MGA deprived Innovention of an opportunity test the veracity of this evidence in open court.[138]  Nevertheless, even without Khare's testimony, the Court finds that substantial evidence supports the jury's verdict regarding the second,

---

[134] *See* R. Doc. 503-1 at p. 13 ("All studies, investigations, determinations, opinions or other documents, including without limitation, opinions of counsel and any documents generated in connection with this or any prior suit or threat of suit, concerning the scope or interpretation, patentability or unpatentability, validity or invalidity, enforceability or unenforceability, or infringement or non-infringement of any claim of any patent-in-suit.").

[135] *See, e.g.,* R. Doc. 584 at p. 16 ("Your Honor, may I just make one point?  I apologize, I know it's late, I know we're close to the jury.  But Mr. Baum stood here and said I was disingenuous to you either today or yesterday. One, I didn't say there were lots of communications, Mr. Khare was the person who spoke to them, there are no written communications, you've already ordered that, your Honor, you've recognized that. I'm sorry I can't produce oral communications in response to a request for production, that's just not possible.").

[136] *See* R. Doc. 587 at p. 156 ("And then counsel said in court yesterday: There are no written communications. You've already ordered that. You've recognized that. So the representation was made, to me, in court, that there were no other communications.  And the only reason these were produced was because I specifically ordered you to produce them yesterday, and to either produce them to the plaintiffs or to produce them to me in camera.  So, if I hadn't done that, we still wouldn't have those.  So it's clear to me that the defendants did not comply with their obligation with respect to the production of documents.").

[137] R. Doc. 587 at p. 157; R. Doc. 576.

[138] In reciting this aspect of the case's history, the Court emphasizes that it is not drawing a negative inference from MGA's decision not to call Khare to testify, but instead is providing context for MGA's actions.

40

subjective *Seagate* prong.  The Court concludes that Innovention has proven the second, subjective *Seagate* prong by clear and convincing evidence.

### D.    The Court Finds that MGA Willfully Infringed the '242 Patent

In sum, as set forth above, Innovention has satisfied both prongs of *Seagate* by clear and convincing evidence.  As a result, the Court finds a matter of law that MGA willfully infringed the '242 patent and will enter judgment accordingly.  Consequently, MGA's motion to have the Court enter judgment that MGA's infringement was not willful pursuant to 35 U.S.C § 284 is **DENIED** and Innovention's motion with respect to its request for the Court to enter judgment that MGA's infringement was willful is **GRANTED**.

### II.    Enhanced Damages Pursuant to 35 U.S.C. § 284

Given that the Court found as a matter of law that MGA's infringement was willful, the Court now turns to Innovention's request for treble damages pursuant to 35 U.S.C. § 284.  Title 35, United States Code, Section 284 allows a court to award up to treble damages to a plaintiff as compensation for a defendant's willful infringement.[139]  Innovention argues that an award of treble damages is appropriate here because "[t]his is a particularly

---

[139] Title 35, United States Code, Section 284 provides:

> Upon finding for the claimant the court shall award the claimant damages adequate to compensate for the infringement, but in no event less than a reasonable royalty for the use made of the invention by the infringer, together with interest and costs as fixed by the court.

> When the damages are not found by a jury, the court shall assess them. In either event the court may increase the damages up to three times the amount found or assessed. Increased damages under this paragraph shall not apply to provisional rights under section 154(d).

> The court may receive expert testimony as an aid to the determination of damages or of what royalty would be reasonable under the circumstances.

egregious case of patent infringement."[140] MGA responds that enhancement is unwarranted because its defenses were not objectively unreasonable under the first, objective prong of *Seagate* and, therefore, MGA did not willfully infringe the '242 patent.  The Court has already rejected MGA's arguments regarding the first *Seagate* prong.[141]  Thus, the Court considers MGA's argument in alternative, which urges the Court to exercise its discretion not to award any enhanced damages because, according to MGA, this case is not one warranting enhancement.

"Enhanced damages are a punitive measure taken by a court to penalize a willful infringer for his or her increased culpability." *SSL Services, LLC v. Citrix Sys., Inc.*, 2012 WL 4092449, at *2 (E.D. Tex. Sept. 17, 2012) (citing *Jurgens v. CBK, Ltd.*, 80 F.3d 1566, 1570 (Fed. Cir. 1996)).  Whether to grant enhanced damages pursuant to 35 U.S.C. § 284 requires the Court to conduct a two-step analysis.  *Whitserve, LLC v. Computer Packages, Inc.*, 694 F.3d 10, 37 (Fed. Cir. 2012) (citing *Jurgens*, 80 F.3d at 1570). "First, the fact-finder must determine whether an infringer is guilty of conduct upon which increased damages may be based" – referred to as the "culpability" prong.  *Whitserve*, 694 F.3d at 37 (quoting *Jurgens*, 80 F.3d at 1570).  "If so, the court then determines, exercising its sound discretion, whether, and to what extent, to increase the damages award given the totality of the circumstances." *Whitserve*, 694 F.3d at 37 (quoting *Jurgens*, 80 F.3d at 1570).  A court, in its discretion, may decline to award enhanced damages or may award up to treble

---

[140] R. Doc. 602 at p. 9.

[141] Again, MGA has not advanced any argument that its actions were not subjectively willful under the second prong of *Seagate*.  Given that the Court found that the jury's verdict as to the second, subjective *Seagate* prong was supported by substantial evidence, and thus that Innovention has satisfied the second, subjective *Seagate* prong, any argument that MGA's actions were not subjectively willful would be unpersuasive.

damages.   35 U.S.C. § 284 ("[T]he court may increase the damages up to three times the amount found [by the jury] or assessed" by the court.); *Transclean Corp. v. Bridgewood Servs., Inc.*, 290 F.3d 1364, 1378 (Fed. Cir. 2002).

### A.   MGA's Culpability

"An act of willful infringement satisfies th[e] culpability requirement and is, without doubt, sufficient to meet the first requirement to increase a compensatory damages award." *Whitserve*, 694 F.3d at 37 (quoting *Jurgens*, 80 F.3d at 1570 (citing *Read Corp. v. Portec, Inc.*, 970 F.2d 816, 826-27 (Fed. Cir. 1992)).  "While a finding of willful infringement does not mandate that damages be increased . . . , after an express finding of willful infringement, a trial court should provide reasons for not increasing a damages award." *Tate Access Floors, Inc. v. Maxcess Techs., Inc.*, 222 F.3d 958, 972 (Fed. Cir. 2000) (internal quotation marks omitted) (citing *Jurgens*, 80 F.3d at 1573).  As this Court has found as a matter of law that MGA's infringement was willful, the culpability prong of the Court's analysis is satisfied.  Thus, the Court proceeds to the second step of the inquiry, and considers whether the totality of the circumstances justifies an award of enhanced damages in this case.

### B.   The Totality of the Circumstances Justifies an Award of Enhanced Damages

"The paramount determination in deciding to grant enhancement and the amount thereof is the egregiousness of the defendant's conduct based on all the facts and circumstances." *Read*, 970 F.2d at 826; *Cleancut, LLC v. Rug Doctor, Inc.*, 2013 WL 441209, at *2 (D. Utah Feb. 5, 2013) (analyzing the *Read* factors and awarding enhanced damages after a finding of willful infringement). When considering the totality of the

circumstances, the Court must examine the "*Read* factors." *i4i Ltd. P'ship v. Microsoft Corp.*, 598 F.3d 831, 859 (Fed. Cir. 2010) (citing *Read*, 970 F.2d at 267-27); *SRI Int'l, Inc. v. Advanced Tech. Labs., Inc.*, 127 F.3d 1462, 1469 (Fed. Cir. 1997) (citing *Read*, 970 F.2d at 826-27). The nine *Read* factors include "(1) whether the infringer deliberately copied the ideas or design of another; (2) whether the infringer, when he knew of the other's patent, investigated the patent and formed a good faith belief that it was invalid or that it was not infringed; (3) the infringer's behavior in the litigation; (4) the infringer's size and financial condition; (5) the closeness of the case; (6) the duration of the misconduct; (7) the remedial action by the infringer; (8) the infringer's motivation for harm; and (9) whether the infringer attempted to conceal its misconduct." *Spectralytics, Inc. v. Cordis Corp.*, 649 F.3d 1336, 1348 (Fed. Cir. 2011) (citing *Read*, 970 F.2d at 826-27).

### (1)   Infringer's Copying

First, Innovention argues that MGA deliberately copied its game and submits that "[c]opying is undoubtedly the most significant factor in deciding whether enhanced damages are warranted."[142]  MGA reiterates the argument that it "presented substantial evidence at trial that it independently developed Laser Battle."[143]  The jury found that MGA copied Innovention's game. As set forth above, the Court has held that substantial evidence supports the jury's verdict and has found the same.[144]  Likewise, the Court agrees with Innovention that copying is a very important factor in deciding whether enhanced damages are warranted.  *See Amsted Indus., Inc. v. Buckeye Steel Castings Co.*, 24 F.3d 178 (Fed.

---

[142] R. Doc. 602 at p. 20.

[143] R. Doc. 607 at p. 23.

[144] R. Doc. 574-3 (jury verdict form).

Cir. 1994) (affirming an award of treble damages and attorneys' fees in view of infringer's copying, inappropriate litigation behavior and jury's finding of willfulness); *Engineered Prods. Co. v. Donaldson Co., Inc.*, 147 F. App'x 979, 991-92 (Fed. Cir. 2005) (affirming award of treble damages where infringer engaged in "deliberate copying"); *Jurgens*, 80 F.3d at 1569-73 (requiring the district court to reconsider its decision not to enhance damages in a case where the infringer copied the patented invention); *Powell v. Home Depot, USA, Inc.*, 715 F.Supp.2d 1285, 1296 (S.D. Fla. 2010) (awarding treble damages where infringer "deliberately and callously" copied the claimed invention).  Because MGA copied Innovention's game, the first *Read* factor weighs heavily in favor of enhancement in this case.

### (2)   Infringer's Investigation of the '242 Patent

Second, Innovention asserts that MGA "did virtually nothing to investigate the scope of Innovention's patent rights, despite numerous warnings."[145]  MGA argues – given that it had no duty to obtain an opinion of counsel following *Seagate* and it did not have notice of the '242 patent until it was sued – that "this *Read* factor should be deemed no more than neutral."[146]  The Court has already concluded, above, that MGA had notice of the claims covered in the '242 patent on the date the patent issued.  Furthermore, though the law did not require MGA to obtain an opinion of counsel from Siegel, MGA did so.  MGA would not allow Innovention to conduct discovery regarding Siegel's opinion, claiming that it was protected by the attorney-client privilege.  Later, MGA sought to use Siegel's opinion as a defense to Innovention's allegation of willful infringement.  Consequently, the Court

---

[145] R. Doc. 602 at p. 20.

[146] R. Doc. 607 at p. 25.

sanctioned MGA for using the Siegel letters as both a sword and shield.  After being sanctioned, MGA did not call Khare as a witness, which deprived Innovention of the opportunity to cross-examine Khare regarding the Siegel letters.  Thus, the record contains no evidence that MGA "investigated the scope of the patent and formed a good-faith belief that it was invalid or that it was not infringed" by obtaining an opinion of counsel, *or otherwise.  Read*, 970 F.2d at 827.  Consequently, the Court finds that the second *Read* factor weighs in favor of enhancement.  *See Spectralytics, Inc. v. Cordis Corp.*, 834 F.Supp.2d 920, 924 & 924 n.2 (D. Minn. 2011) ("[Defendant's] letter [prepared by defendant's in-house lawyer] in response to [patentee's] infringement allegations was both superficial and tardy.  Because the record contains no other evidence to show that [defendant] 'investigated the scope of the patent and formed a good-faith belief that it was invalid or that it was not infringed,' the Court finds that this second *Read* factor weighs in favor of awarding enhanced damages.").

### (3)    Infringer's Behavior in the Litigation

Third, in support of its assertion that "MGA's behavior in this case has been deplorable," Innovention contends that MGA (1) has been sanctioned several times in this matter, (2) filed seven motions for summary judgment, none of which were granted, (3) frivolously moved to reopen discovery to support a post-trial motion under 35 U.S.C. § 285, (4) untimely moved to sever and stay the case against Wal-Mart and Toys "R" Us, and (5) engaged in misconduct that required Innovention to prepare for and file additional motions during trial.  According to Innovention, "[i]t is clear that MGA was seeking to use its superior size and resources to bully Innovention into submission."[147]  MGA responds that

[147] R. Doc. 602 at p. 22.

46

Innovention itself "has engaged in a pattern and practice of deplorable and sanctionable conduct in this case."[148]   MGA further observes that Innovention's cross-motions for summary judgment were also denied.

Though Innovention has also been sanctioned in this case, the Court concludes that the third *Read* factor nevertheless weighs in favor of enhancement.   MGA engaged in misconduct throughout this litigation and employed particularly aggressive tactics immediately prior to and during trial.   As detailed above, MGA's actions required Innovention and the Court to devote significant resources to addressing the admissibility of the Siegel letters both before and during trial.   Because MGA refused to produce communications regarding the Siegel letters, the Court had to order MGA to produce them. Innovention also had to prepare to depose Khare regarding the Siegel letters, only to be informed that MGA would not longer call Khare at trial.   Likewise, Innovention had to depose two undisclosed witnesses during the trial after a long day in the courtroom, rather than preparing for the next day.[149]   Indeed, even after the jury returned its verdict, MGA continued to unnecessarily multiply the proceedings by filing untimely objections to which Innovention had to respond.[150]   *Jurgens*, 80 F.3d at 1571 (stating that an infringer's "egregious conduct in infringement litigation . . . may be used as a factor in determining

---

[148] R. Doc. 607 at p. 25.

[149] *See* R. Doc. 553 (finding that "Defendants failed to comply with the Court's scheduling order by their late disclosure of the names of Carter and Bland" and that "[Defendants'] failure has caused and will continue to cause substantial inconvenience and cost to Plaintiff," and permitting Innovention to depose such witnesses in an effort to cure the prejudice)

[150] *See* R. Doc. 593 at p. 8 (finding that Defendants' statement "that they were unable to review the Court's verdict form and to enter their objections before the verdict form was given to the jury" was "patently false.").

whether or how much to increase a damages award once [willful infringement] is found"). As a result, the Court finds that the third *Read* factor weighs in favor of enhancement.

### (4)     Infringer's Size and Financial Condition

Fourth, Innovention reiterates that this litigation has been a David-verus-Goliath fight, given that Innovention is a tiny three-person company[151] and MGA is a toy behemoth with sales of $300 million in 2011.[152] With respect to this factor, a "[d]efendant's size and financial condition should be viewed both relative to the Plaintiff and also individually to ensure that enhanced damages would not unduly prejudice [defendant's] non-infringing business." *SSL Services*, 2012 WL 4092449, at *5 (internal quotation marks and citations omitted); *see also Read*, 970 F.2d at 827 (citing with approval a trial court's holding that, "[i]f defendant were the giant and plaintiff the small independent, I would make it treble") (citation omitted). Evidence introduced at trial indicates that MGA is a large company with a solid financial condition arguably profitable enough to pay enhanced damages. Moreover, if the Court were to award enhanced damages, such an award would not unduly prejudice MGA's non-infringing business. *SSL Services*, 2012 WL 4092449, at *5; *Cleancut*, 2013 WL 441209, at *3. Thus, the fourth *Read* factor weighs in favor of enhancement.

### (5)     The Closeness of the Case

Fifth, as to the closeness of the case, the Court disposed of MGA's anticipation defense on summary judgment and MGA did not appeal the Court's decision. Moreover, the jury completely rejected all of MGA's theories, and after just three hours of

---

[151] R. Doc. 583 at p. 34 (Larson).

[152] R. Doc. 588 at p. 75 (Butler).

deliberations, swiftly returned a verdict in favor of Innovention on all issues.[153]  The jury

also found that MGA's infringement was willful.  After reviewing the entire record, the

evidence introduced at trial, and the jury's findings of fact, the Court determined as a

matter of law that MGA's defenses were not objectively reasonable.  In sum, this case was

not close.  *SSL Services*, 2012 WL 4092449, at *5; *Cleancut*, 2013 WL 441209, at *3.  The

fifth *Read* factor weighs in favor of enhancement.

### (6)       Duration of Infringer's Misconduct

Sixth, as to the duration of MGA's infringement, MGA only ceased its willful

infringement – more than two years after Innovention initiated this lawsuit – because this

Court enjoined MGA from making, importing, selling and/or offering Laser Battle for

sale.[154]  Given the manner in which this case has been litigated, there is no indication MGA

would have voluntarily ceased its infringing behavior absent Court order.  *Univ. of*

*Pittsburgh of Com. Sys. of Higher Educ. v. Varian Med. Sys., Inc.*, 2012 WL 1436569, at

*6 (W.D. Pa. Apr. 25, 2012).  The sixth *Read* factor weighs in favor of enhancement.

### (7)       Infringer's Remedial Actions

Seventh, as to MGA's remedial measures, MGA argues that this factor weighs against

enhancement because it did not begin selling Laser Battle after the Federal Circuit vacated

the permanent injunction this Court entered.  The remedial measures factor examines

whether an alleged infringer took any affirmative action after receiving notice it needed to

remedy its actions.  *Varian Med. Sys., Inc.*, 2012 WL 1436569, at *6.  At the time the

---

[153] R. Doc. 591 at p. 591 at p. 137 (jury charged); R. 592 at p. 3 (jury verdict returned); R. Doc. 574-3 (jury verdict form).

[154] R. Doc. 220.

Federal Circuit remanded this case, the Court's injunction had been in effect for more than one year.  Innovention continued to press forward with its allegations against MGA. Consequently, MGA's decision to refrain from engaging in further allegedly infringing behavior is not the type of affirmative action courts look to in order to determine whether a defendant has sought to remedy his actions.  MGA's decision to forgo any remedial measures weighs in favor of enhancement.  *Varian Med. Sys., Inc.*, 2012 WL 1436569, at *6.

### (8)   Infringer's Motivation for Harm

Eighth, given that both MGA and Innovention are in the business of selling toys, they are direct business competitors.  This *Read* factor weighs in favor of enhancement. *Cleancut*, 2013 WL 441209, at *3; *Varian Med. Sys., Inc.*, 2012 WL 1436569, at *6.

### (9)   Infringer's Concealment of Misconduct

The final *Read* factor requires the Court to determine whether MGA concealed its infringement "either through advertising and selling the products covertly or through concealing evidence of [the] infringing conduct."  *Varian Med. Sys., Inc.*, 2012 WL 1436569, at *7 (quotation marks and citation omitted).  While there is evidence in the record that Shapiro inappropriately concealed information regarding Innovention's game from the PTO, MGA openly sold Laser Battle at retail without making any attempt to hide its infringing activities.  As a result, the Court concludes that this is the only *Read* factor that does not weigh in favor of enhancement.

Having considered the entire record, the manner in which this case has been litigated, the sizable disparity been Innovention and MGA, MGA's willful infringement of the '242 patent, and the fact that on balance the *Read* factors weigh heavily in favor of

enhancement, the Court finds, in its discretion and based on the totality of the circumstances, that an award of treble damages is warranted in this case. *See SDS Korea Co. Ltd. v. SDS USA, Inc.*, 2012 WL 3114753, at * 3 (D. N.J. July 31, 2012) (awarding treble damages where infringer's behavior was willful and ongoing for several years, infringer acted in bad faith, and did not attempt to investigate the proper scope of the patents infringed). As a result, Innovention's motion with respect to its request for enhanced damages pursuant to 35 U.S.C. § 284 is **GRANTED**. The Court will treble the amount of the damages the jury awarded[155] to **$4,719,489.00**.

### III.    Finding of Exceptional Case and Attorneys' Fees

Innovention further requests the Court to find that this case is exceptional within the meaning of 35 U.S.C. § 285 and, accordingly, to award Innovention the attorneys' fees it incurred in this matter. Title 35, United States Code, Section 285 ("Section 285") provides that "[t]he court in exceptional cases may award reasonable attorney fees to the prevailing party." When deciding whether to award attorneys' fees under Section 285, this Court must conduct a two-step analysis. "First, the court must determine whether the prevailing party has proved by clear and convincing evidence that the case is exceptional." *MarcTec, LLC v. Johnson & Johnson and Cordis Corp.*, 664 F.3d 907, 915-16 (Fed. Cir. 2012) (internal citations omitted). "If the district court finds that the case is exceptional, it must then determine whether an award of attorneys fees is justified." *MarcTec*, 664 F.3d at 915-16. According to the Federal Circuit, "[a]n award of attorneys fees is permissible 'when there has been some material inappropriate conduct related to the matter in litigation, such as willful infringement, fraud or inequitable conduct in procuring the patent, misconduct

---

[155] That is, $1,573,163.00. *See* R. Doc. 574-3 (jury verdict form).

during litigation, vexatious or unjustified litigation, conduct that violates Fed. R. Civ. P. 11, or like infractions.' " *iLOR, LLC v. Google Inc.*, 631 F.3d 1372, 1376-77 (Fed. Cir. 2011) (quoting *Brooks Furniture Mfg., Inc. v. Dutailier Int'l Inc.*, 393 F.3d 1378, 1381 (Fed. Cir. 2005)); *see also Tate Access Floors*, 222 F.3d at 972 ("While a finding of willful infringement does not mandate . . . that attorneys fees be awarded, after an express finding of willful infringement, a trial court should provide reasons . . . for not finding a case exceptional for the purpose of awarding attorneys fees." (internal quotation marks omitted) (citing *Jurgens*, 80 F.3d at 1573)); *Modine Mfg. Co. v. Allen Group, Inc.*, 917 F.2d 538, 543 (Fed. Cir. 1990) ("An express finding of willful infringement is a sufficient basis for classifying a case as 'exceptional,' and indeed, when a trial court denies attorney fees in spite of a finding of willful infringement, the court must explain why the case is not 'exceptional' within the meaning of the statute.").

"Willful infringement is one of the permissible reasons for awarding attorneys fees." *Varian Med. Sys., Inc.*, 2012 WL 1436569, at *8 (citing *Brooks Furniture*, 393 F.3d at 1381). Innovention has satisfied its burden of proving, by clear and convincing evidence, that this is an exceptional case under Section 285 in light of the jury's verdict finding that MGA's infringement was willful and the Court's finding as a matter of law that MGA's infringement was willful. *Varian Med. Sys., Inc.*, 2012 WL 1436569, at *8; *SDS Korea Co.*, 2012 WL 3114753, at * 3. In addition, the Court may consider the same *Read* factors set forth above *vis-à-vis* enhanced damages when determining whether a case is exceptional. *See nCube Corp. v. Seachange Int'l, Inc.*, 436 F.3d 1317, 1325 (Fed. Cir. 2006) (affirming trial court's finding of exceptional case and decision to award attorney's fees where the jury made a willfulness finding and the *Read* factors weighed in favor of enhanced damages).

Given that the *Read* factors overwhelming weigh in favor of enhanced damages, the Court concludes that these factors also indicate that this litigation has been "exceptional" within the meaning of Section 235. As a result, the Court finds that this is an exceptional case.

Next, the Court must determine, in its discretion, whether an award of attorneys' fees is justified. Though our legal system generally adheres to the "American Rule," whereby each party in a lawsuit ordinarily bears its own attorneys' fees, "in certain categories of cases Congress has carved out exceptions to the American Rule and allowed for recovery of attorneys' fees." *Bywaters v. United States*, 670 F.3d 1221, 1227 (Fed. Cir. 2012). Section 285 is such an exception to the American Rule. *Wedgetail Ltd. v. Huddleston Deluxe, Inc.*, 576 F.3d 1302, 1304 (Fed. Cir. 2009). The purpose of Section 285 is "to compensate the prevailing party for its monetary outlays in the prosecution or defense of the suit." *Mathis v. Spears*, 857 F.2d 749, 755 (Fed. Cir. 1988) (quotation marks, citation, and emphasis omitted); *Varian Med. Sys., Inc.*, 2012 WL 1436569, at *8 ("Section 285 was designed to discourage individuals from wasting the resources of both the litigants and the Court, by engaging in practices such as willful infringement and unnecessary litigation tactics."). Consequently, the amount awarded should – if appropriate – include time spent preparing the party's claim for attorneys' fees. *Central Soya Co., Inc. v. Geo. A. Hormel & Co.*, 723 F.2d 1573, 1578 (Fed. Cir. 1983). Having considered the purpose of Section 285, the record, and the entire history of this litigation, the Court finds, exercising its discretion, that an award of attorneys' fees is appropriate. *Varian Med. Sys., Inc.*, 2012 WL 1436569, at *8; *SDS Korea Co.*, 2012 WL 3114753, at * 3. Innovention's motion with respect to its request for a finding of exceptional case and an award of attorneys' fees pursuant to 35 U.S.C. § 285 is **GRANTED**.

53

While the Court has the discretion to award attorneys' fees, the ultimate amount of attorneys' fees recovered must nevertheless be reasonable.  *Lam, Inc. v. Johns-Manville Corp.*, 718 F.2d 1056, 1068 (Fed. Cir. 1983); *SDS Korea Co.*, 2012 WL 3114753, at * 3.  The parties have litigated this case for six long years – so long in fact that both Innovention and MGA have changed counsel.  The Court must review thousands of pages of billing records to determine whether the amount Innovention has requested is reasonable.  As a result, the Court **DEFERS** ruling on the amount of attorneys' fees to be awarded and hereby **REFERS** this issue to the assigned U.S. Magistrate Judge for a report and recommendation.[156]

## IV.    Costs

Innovention also seeks recovery of its taxable costs under 28 U.S.C. § 1920.  Innovention further seeks non-taxable costs under 35 U.S.C. § 285 because this is an exceptional case.

### A.    Taxable Costs

Pursuant to 28 U.S.C. § 1920, the Court may tax the following costs:

(1)    Fees of the clerk and marshal;

(2)    Fees for printed or electronically recorded transcripts necessarily obtained for use in the case;

(3)    Fees and disbursements for printing and witnesses;

(4)    Fees for exemplification and the costs of making copies of any materials where the copies are necessarily obtained for use in the case;

---

[156] By referring this issue to the assigned U.S. Magistrate Judge, the Court is in no way assessing the reasonableness of the sum Innovention has requested.  Both local counsel and patent counsel retained to represent Innovention in this case are well-qualified and respected.

(5)     Docket fees under section 1923 of this title;

(6)     Compensation of court appointed experts, compensation of interpreters, and salaries, fees, expenses, and costs of special interpretation services under section 1828 of this title.

Innovention seeks to recover fees (1) assessed by the Clerk of Court and the U.S. Marshal ($910); (2) for printed or electronically recorded transcripts ($13,889.98); (3) for exemplification and the costs of making copies of materials ($86,983.45); and (4) for compensation of court appointed experts and interpreters, and salaries, fees, expenses and costs of a special interpretation service under 28 U.S.C. § 1928 ($17,156.00).   MGA challenges Innovention's request for copying and exemplification because "Innovention provided no proof that they were necessary for use in this case."[157]   MGA also challenges Innovention's request to recover its interpreters' fees.[158]  At this time, the Court will award Innovention its fees assessed by the Clerk of Court and the U.S. Marshal ($910) and fees incurred for printed or electronically recorded transcripts ($13,889.98).    As to Innovention's request for exemplification and copying costs and interpreters' costs, a determination of those amounts is also **REFERRED** to the assigned U.S. Magistrate Judge for a report and recommendation.  As a result, Innovention's motion with respect to its request to recover taxable costs is **GRANTED IN PART** and **DEFERRED IN PART**.

---

[157] R. Doc. 607 at p. 35.

[158] R. Doc. 607 at pp. 35-36.  Innovention's game is manufactured in China.  *See, e.g.*, R. Doc. 583 at p. 104 (Larson).  As part of the damages portion of the trial, Innovention elicited testimony from the Wugeng Li ("Li"), the president of the company that manufactures Innovention's game.  Li testified through an interpreter.  *See, e.g.*, R. Doc. 585 at pp. 12-23 (Li).

### B.  Non-Taxable Costs

Because this is an exceptional case, Innovention seeks recovery of non-taxable costs pursuant to 35 U.S.C. § 285 for (1) fees for trial presentation professionals ($36,122.88); (2) legal research costs ($10,690.33); (3) courier and postage costs ($4,929.13); (4) telephone costs ($110.77); (5) travel and lodging expenses ($53,833.18); and (6) any of the costs, identified above as taxable costs, if the Court determines such requested taxable costs are in fact non-taxable costs.  MGA argues that Innovention's requested non-taxable costs are not reasonable.

"The Federal Circuit has interpreted 35 U.S.C. § 285 as including not only the recovery of attorney fees, but also the recovery of all reasonable expenses incurred in prosecuting the entire action.  Thus, upon finding a case exceptional, an award of all reasonable and necessary expenses related to the litigation is properly within the scope of 35 U.S.C. § 285."  *Nikko Materials USA, Inc. v. R.E. Serv. Co., Inc.*, 2006 WL 118438, at *5 (N.D. Cal. Jan. 13, 2006); *see also Powell v. Home Depot, USA, Inc.*, 2010 WL 4116488, at *24 (S.D. Fla. Sept. 14, 2010) (recommending that the prevailing party be awarded travel expenses incurred from attending a meeting with witnesses as part of attorneys' fees award), *rep. & recommendation adopted by* 2010 WL 4102933 (S.D. Fla. Oct. 18, 2010). Given that this is an exceptional case, the Court agrees that Innovention should be awarded its non-taxable costs, provided that the amount of non-taxable costs requested is reasonable. The Court **REFERS** a determination of Innovention's reasonable non-taxable costs to the assigned U.S. Magistrate Judge for a report and recommendation.  As a result, Innovention's motion with respect to its request to recover non-taxable costs is **GRANTED IN PART** and **DEFERRED IN PART**.

### V.   Expert Witness Fees

Innovention further requests the Court, using its inherent authority, to award Innovention the fees it incurred to retain expert witnesses in order to sanction Defendants for their misconduct.  MGA, on behalf of all Defendants, responds that "none of Defendants' alleged misconduct approaches 'defiling the temple of justice.' "[159]  Consequently, MGA argues that "sanctions beyond those contemplated by the Federal Rules and the patent laws are unwarranted."[160]

Title 35, United States Code, Section 285 does not permit a federal district court to award a prevailing party its expert witness fees. 35 U.S.C. § 285; *Takeda Chem. Indus., Ltd. v. Mylan Labs., Inc.*, 549 F.3d 1381, 1391 (Fed. Cir. 2008).  Nevertheless,  a court has inherent authority "to impose sanctions in the form of reasonable expert fees in excess of what is provided for by statute." *Takeda,* 549 F.3d at 1391; *MarcTec*, 664 F.3d at 921 (citing *Takeda*, 549 F.3d at 1391).  A court should award expert witness fees under its inherent authority only when it makes  a "finding of fraud or bad faith whereby the 'very temple of justice has been defiled.' " *Amsted Indus.*, 23 F.3d at 378 (quoting *Chambers v. NASCO, Inc.*, 501 U.S. 32, 46 (1991)); *MarcTec*, 664 F.3d at 921.  "[N]ot every case that qualifies as exceptional under § 285 will also qualify for sanctions under the court's inherent power." *MarcTec*, 664 F.3d at 921.

The Court concludes that Innovention should not be awarded its reasonable expert witness fees.  As summarized above, Defendants engaged in wasteful litigation tactics that required the Court and Innovention to devote many precious resources to remedying

---

[159] R. Doc. 607 at p. 36.

[160] R. Doc. 607 at p. 36.

Defendants' misconduct.   Nevertheless, Defendants' conduct was not so egregious that justifies a "finding of fraud or bad faith whereby the very temple of justice has been defiled." *Amsted Indus.*, 23 F.3d at 378.   Consequently, the Court, having considered the entire record and the proceedings before, during and after trial, declines to exercise its discretion to award Innovention its reasonable expert witness fees  under the Court's inherent authority.   Thus, Innovention's motion with respect to its request for reasonable expert witness fees is **DENIED.**

### VI.   Prejudgment Interest

Upon a finding of patent infringement, "the court shall award patent damages  . . . together with interest and costs as fixed by the court." 35 U.S.C. § 284. Prejudgment interest should be awarded under Section 284 absent some justification for withholding such an award. *Gen. Motors Corp. v. Devex Corp.*, 461 U.S. 648, 657 (1983); *Telcordia Techs., Inc. v. Cisco Sys., Inc.*, 612 F.3d 1365, 1378 (Fed. Cir. 2010). Thus, Innovention is entitled to prejudgment interest on the compensatory damages award pursuant to 35 U.S.C. § 284, calculated from the date infringement began to the date of judgment.  *Bio-Rad Labs., Inc. v. Nicolet Instrument Corp.*, 807 F.2d 964, 967 (Fed. Cir. 1986).

"The purpose of prejudgment interest is to place the patentee in as good a position as he would have been had the infringer paid a reasonable royalty instead of infringing." *SSL Services*, 2012 WL 4092449, at *6 (citing *Beatrice Foods v. New England Printing*, 923 F.2d 1576, 1580 (Fed. Cir. 1991)).  Innovention argues that in order to fully compensate it for the use of funds Innovention would have had but for Defendants' infringement, the Court should award Innovention prejudgment interest at the prime rate, compounded

annually.[161]  Innovention has submitted a 28 U.S.C. § 1746 declaration from its damages expert, Steven Boyles ("Boyles"), in support of its request for prejudgment interest. According to Boyles, an award of prejudgment interest at the prime rate, compounded annually, is appropriate because (1) Innovention borrowed money at a rate of interest that exceeded the prime rate; (2) Innovention, in essence, provided Defendants with an involuntary, unsecured loan at times when it could have used those funds to avoid having to draw on its lines of credit; (3) MGA entered into numerous licensing agreements in which it agreed to compensate licensors at the prime rate of interest, or in some instances, at a higher rate, for overdue royalties; and (4) Innovention's invoices reflect that it charges customers at a rate of 1.5% per month (18% per year) for unpaid balances on purchases made.[162]  Boyles has supplied the Court with an analysis of the interest that would be due if the Court applied the average prime interest rate from the date Defendants' infringement began through the date of judgment.

MGA responds that Innovention's requested interest rate is too high, because it "incorrectly assumes [Innovention] could charge Defendants the 'prime rate.' "[163]  MGA submits that, because the risk MGA would default on its obligations is very low, any hypothetical loan Innovention would make to MGA would charge a very low interest rate to reflect that there would be little risk of default.  MGA argues the Court "should adopt the

---

[161] R. Doc. 602 at p. 26.

[162] R. Doc. 602 at pp. 27-28; R. Doc. 602-2 (Boyles declaration and exhibits referenced therein); R. Doc. 602-3 (Larson declaration and exhibits referenced therein); R. Doc. 602-8 (Otteson declaration and exhibits referenced therein).

[163] R. Doc. 607 at p. 33.

average commercial interest rate (minimal risk of default) values" set forth in exhibit 2 of MGA's opposition memorandum.[164]

After carefully considering the parties' positions, the Court finds that an award of prejudgment interest at the prime rate, compounded annually, would serve to place Innovention in as good a position as it would have been had Defendants paid Innovention a reasonable royalty. As a result, the Court awards Innovention prejudgment interest on the $1,573,163.00 damages award at the prime rate, compounded annually, calculated from the date infringement began to the date of judgment. The Court believes that awarding Innovention prejudgment interest at the prime rate is the fairest way to achieve the compensatory purpose of prejudgment interest. *See SSL Services*, 2012 WL 4092449, at *7 (awarding patentee prejudgment interest, compounded quarterly, at the prime rate averaged over the actual period of infringement). The Court will determine the amount of prejudgment interest to be awarded on the date it enters judgment. As a result, Innovention's motion with respect to its request for prejudgment interest at the prime rate, compounded annually, is **GRANTED IN PART** and **DEFERRED IN PART**.

### VII.   Post-Judgment Interest

Innovention is entitled to post-judgment interest calculated from the date of entry of judgment at a rate equal to the weekly average 1-year constant maturity U.S. Treasury yield, for the calendar week preceding the date of the judgment. *See* 28 U.S.C. § 1961(a). The "[i]nterest shall be computed daily to the date of payment" and "shall be compounded annually." 28 U.S.C. § 1961(b). Furthermore, an award of post-judgment interest applies to all elements of the judgment, including damages and prejudgment interest. *Fuchs v.*

---

[164] R. Doc. 607-2 (exhibit 2 to MGA's opposition memorandum).

60

*Lifetime Doors, Inc.*, 939 F.2d 1275, 1280 (5th Cir. 1991); *Boston Old Colony Ins. v. Tiner Assocs., Inc.*, 288 F.3d 222, 234 (5th Cir. 2002) (citations omitted).   As a result, Innovention's motion with respect to its request for post-judgment interest is **GRANTED**.

### VIII.  Injunction

As a practicing patentee, Innovention also requests the Court to enter a permanent injunction to prevent MGA from further infringing the '242 patent.   *See eBay, Inc. v. MercExchange, LLC*, 547 U.S. 388 (2006).  Defendants ceased selling Laser Battle in 2010 and do not oppose Innovention's request for a permanent injunction "with the caveat that their opposition not be deemed an admission with respect to any other issue in the case."[165] Innovention "accepts that caveat."[166]   The Court will enter a permanent injunction. Innovention shall provide language for the proposed injunction to the Court.

### *Conclusion*

Accordingly, for the reasons set forth above,

**IT IS ORDERED** that MGA's motion is **DENIED**.[167]

**IT IS FURTHER ORDERED** that Innovention's motion with respect to its request that the Court enter judgment that MGA's infringement was willful is **GRANTED**.

**IT IS FURTHER ORDERED** that Innovention's motion with respect to its request for enhanced damages is **GRANTED**.  The Court will treble the amount of the damages the jury awarded to **$4,719,489.00**.

---

[165] R. Doc. 602 at p. 9 n.1.

[166] R. Doc. 602 at p. 9 n.1.

[167] R. Doc. 598.

**IT IS FURTHER ORDERED** that Innovention's motion with respect to its request for a finding of exceptional case and an award of attorneys' fees pursuant to 35 U.S.C. § 285 is **GRANTED IN PART** and **DEFERRED IN PART**.  Given that this is an exceptional case, the Court will **AWARD** attorneys' fees. The Court **DEFERS** ruling on the amount of attorneys' fees to be awarded and hereby **REFERS** this issue to the assigned U.S. Magistrate Judge for a report and recommendation.

**IT IS FURTHER ORDERED** that Innovention's motion with respect to its request for taxable costs pursuant to 28 U.S.C. § 1920 is **GRANTED IN PART** and **DEFERRED IN PART**.  The Court **AWARDS** Innovention its fees assessed by the Clerk of Court and the U.S. Marshal ($910) and fees incurred for printed or electronically recorded transcripts ($13,889.98).  As to Innovention's request for exemplification and copying costs and interpreters' costs, a determination of those reasonable amounts is hereby **REFERRED** to the assigned U.S. Magistrate Judge for a report and recommendation.

**IT IS FURTHER ORDERED** that Innovention's motion with respect to its request for non-taxable costs pursuant to 35 U.S.C. § 285 is **GRANTED IN PART** and **DEFERRED IN PART**.  The Court **AWARDS** Innovention its reasonable non-taxable costs pursuant to 35 U.S.C. § 285.  The Court hereby **REFERS** a determination of Innovention's reasonable non-taxable costs to the assigned U.S. Magistrate Judge for a report and recommendation.

**IT IS FURTHER ORDERED** that Innovention's motion with respect to its request for expert witness fees pursuant to 35 U.S.C. § 285 is **DENIED**.

**IT IS FURTHER ORDERED** that Innovention's motion with respect to its request for prejudgment interest is **GRANTED IN PART** and **DEFERRED IN PART**. The Court

**AWARDS** Innovention prejudgment interest on the $1,573,163.00 damages award at the prime rate, compounded annually, calculated from the date infringement began to the date of judgment.  The Court **DEFERS** calculating the amount of prejudgment interest to be awarded until the date it enters judgment.

**IT IS FURTHER ORDERED** that Innovention's motion with respect to its request for post-judgment interest is **GRANTED**.  The Court **AWARDS** Innovention post-judgment interest pursuant to 28 U.S.C. § 1961.

**IT IS FURTHER ORDERED** that Innovention shall provide proposed language for the injunction to the Court.

New Orleans, Louisiana, this ___17th___ day of June, 2013.

_____
**SUSIE MORGAN**
**UNITED STATES DISTRICT JUDGE**